No. 95-011

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

IN THE MATTER OF INQUIRY
INTO M.M., A.D., and L.D.,
Youths in Need of Care.

APPEAL FROM:   District Court of the Tenth Judicial District,
               In and for the County of Fergus,
               The Honorable Byron L. Robb, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Torger S. Oaas, Attorney at Law, Lewistown, Montana

        For Respondent:

        Honorable Joseph P. Mazurek, Attorney General;
        Cregg Coughlin, Assistant Attorney General, Helena,
        Montana

        Thomas P. Meissner, County Attorney, Lewistown,
        Montana

        Jon A. Oldenburg, Attorney at Law, Lewistown,
        Montana

Submitted on Briefs:   October 19, 1995

Decided:   November 21, 1995

Filed:   NOV 21 1995

FILED

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Chief Justice J. A. Turnage, delivered the Opinion of the Court.

P.D., the mother of M.M., A.D. and L.D., appeals the decision of the Tenth Judicial District Court, Fergus County, terminating her parental rights. We affirm.

P.D. raises the following issues on appeal:

1. Did the District Court commit reversible error by admitting hearsay testimony of P.D.'s minor children?

2. Did the District Court err in affording undue weight to the testimony of Gwen Glidewell?

3. Did the District Court err in refusing to grant P.D. a continuance in order to produce a rebuttal witness to Gwen Glidewell?

4. Did the District Court err in terminating P.D.'s parental rights absent the existence of a court-approved treatment plan?

P.D.'s three daughters, M.M., A.D. and L.D., were born out of wedlock to three different fathers between January 1987 and July 1990. P.D. has neither sought nor received child support from any of the fathers. The father of M.M. filed a relinquishment of his parental rights. The fathers of A.D. and L.D. were served by publication, failed to respond, and a default judgment terminated their parental rights.

On February 1, 1993, the Fergus County Attorney, on behalf of the Department of Family Services (DFS, now part of the Department of Public Health and Human Services, or DPHHS), filed a petition in the Tenth Judicial District Court for temporary investigative authority and protective services for M.M., A.D. and L.D. The

2

petition was in response to allegations of abuse and neglect of M.M., A.D. and L.D. Following a hearing, the District Court granted DFS's petition on February 16, 1993.

On May 3, 1993, the Fergus County Attorney filed a petition for the termination of P.D.'s parental rights and also for DFS to be granted permanent legal custody of M.M., A.D. and L.D. Following the June 20 through 21 hearing, the District Court terminated P.D.'s parental rights and granted DFS permanent custody of M.M., A.D. and L.D. P.D. appeals the termination of her parental rights. Other facts, as relevant to the disposition of the following issues, will be set forth as necessary below.

Issue 1

Did the District Court commit reversible error by admitting hearsay testimony of P.D.'s minor children?

We review district court evidentiary rulings to determine if the court abused its discretion. Mason v. Ditzel (1992), 255 Mont. 364, 370-71, 842 P.2d 707, 712. We will not reverse evidentiary rulings absent a manifest abuse of discretion. Mason, 842 P.2d at 712. Additionally, "a reversal cannot be predicated upon an error in admission of evidence, where the evidence in question was not of such a character to have affected the result." Mason, 842 P.2d at 712 (quoting Lauman v. Lee (1981), 192 Mont. 84, 90, 626 P.2d 830, 834).

Section 41-3-609, MCA (1993), sets forth the criteria for termination of parental rights:

3

The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:

. . .

(c) the child is an adjudicated <u>youth in need of care</u> and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time[.] [Emphasis added.]

Pursuant to §§ 41-3-102(17), 41-3-102(2) and 41-3-102(5), MCA (1993), the term "youth in need of care" includes a child whose health or welfare is harmed or threatened harm by acts or omissions of a person responsible for the child's welfare. Section 41-3-102(8), MCA (1993), defines "harm to a child's health or welfare" as:

the harm that occurs whenever the parent or other person responsible for the child's welfare:

(a) inflicts or allows to be inflicted upon the child physical or mental injury;

(b) commits or <u>allows to be committed sexual abuse or exploitation</u>;

(c) causes failure to thrive or otherwise fails to supply the child with adequate food or fails to supply clothing, shelter, education, or adequate health care, though financially able to do so or offered financial or other reasonable means to do so[.] [Emphasis added.]

P.D. argues that the District Court terminated her parental rights because it found that she had allowed her children to be sexually abused or exploited. While P.D. admits that her daughters were sexually abused by at least two of her male acquaintances, she insists that she did not know of the sexual abuses at the times they occurred. She claims that implicit in the term "allow" is the idea that she had some knowledge that the abuse occurred and yet did nothing to prevent it. She finally argues that the prosecu-

4

tion's only evidence that she knew that the sexual abuse occurred was the hearsay testimony of a therapist repeating statements made to her by P.D.'s daughters. P.D. maintains that the hearsay statements of her daughters do not satisfy any of the exceptions to or exclusions from the hearsay rule and therefore should not have been admitted at trial.

We disagree with P.D.'s argument. First, P.D. presents no authority for her assertion that the phrase "allows to be committed sexual abuse or exploitation" requires actual knowledge that the acts have been committed. Section 41-3-102(5)(b), MCA (1993), explicitly states that abuse and neglect "include harm or threatened harm to a child's health or welfare by the acts or omissions of a person responsible for the child's welfare." [Emphasis added.] This Court has previously held that acts or omissions of a parent or guardian are sufficient to satisfy the requirement of abuse and neglect. See In the Matter of C.A.R. and P.J.R., Youths in Need of Care (1984), 214 Mont. 174, 184, 693 P.2d 1214, 1220.

Second, while the District Court found that P.D. knew of her daughters' sexual abuse, the court specifically stated that her knowledge of the abuse was irrelevant to its ultimate determination. The court found that "even if she did not know of the abuse, she failed to notice what was occurring and repeatedly left the children with persons who were not competent or safe caretakers." Such a finding is supported by the evidence presented at trial and satisfies the requirements of § 41-3-102(5)(b), MCA (1993).

5

Finally, P.D. does not challenge the court's finding that she failed to detect the abuse and left her children with inappropriate supervision. Regardless of P.D.'s knowledge of her daughters' sexual abuse, there is sufficient evidence to support a finding that M.M., A.D. and L.D. are youths in need of care. The disputed hearsay evidence goes only to establish P.D.'s knowledge of the sexual abuse of her children. Because the District Court found that M.M., A.D. and L.D. were youths in need of care regardless of P.D.'s knowledge of the sexual abuse, any error by the court in admitting the challenged evidence was harmless. Mason, 842 P.2d at 712.

## Issue 2

Did the District Court err in affording undue weight to the testimony of Gwen Glidewell?

Glidewell lived with P.D. and her children for a short period of time. Glidewell testified about P.D.'s lifestyle while they lived together. Glidewell's testimony described P.D.'s friends, acquaintances, social habits and living arrangements.

P.D. argues that the District Court gave Glidewell's testimony undue weight. P.D. claims that on cross-examination, Glidewell was exposed as an incredible witness who had a motive to testify falsely against her.

In nonjury trials, the credibility of a witness and the weight which his or her testimony should be afforded is left to the sound discretion of the district court. Keebler v. Harding (1991), 247 Mont. 518, 523, 807 P.2d 1354, 1357. In this case, the District

6

Court was in the best position to hear all of the evidence presented and weigh conflicting testimony. After hearing Glidewell's testimony, as well as the other witnesses' testimony, the court determined that Glidewell was a credible witness. It is not the role of this Court to reweigh the evidence and substitute our judgment for that of the District Court under such circumstances.

We conclude that the District Court did not abuse its discretion in finding Glidewell to be a credible, reliable witness.

## Issue 3

Did the District Court err in refusing to grant P.D. a continuance in order to produce a rebuttal witness to Gwen Glidewell?

At the close of trial, P.D.'s attorney requested a continuance in order to prepare additional testimony to discredit Gwen Glidewell. Particularly, P.D.'s counsel wished to call Gwen Glidewell's mother, Cindy Glidewell, to testify as to Gwen's reputation for truth and honesty.

We review discretionary trial court rulings such as motions for continuances to determine if the court abused its discretion. Montana Rail Link v. Byard (1993), 260 Mont. 331, 337, 860 P.2d 121, 125. In this case, P.D. had already presented testimony from one witness which tended to impeach Gwen Glidewell's reputation for truth and honesty. The court determined that P.D.'s trial counsel was given sufficient notice of Gwen Glidewell's testimony and that additional impeachment testimony was unnecessary. We conclude that

the District Court did not abuse its discretion in denying P.D.'s trial counsel's motion for a continuance.

## Issue 4

Did the District Court err in terminating P.D.'s parental rights absent the existence of a court-approved treatment plan?

Section 41-3-609, MCA (1993), states, in relevant part:

> The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:
> . . .
> (c) the child is an adjudicated youth in need of care and both of the following exist:
> (i) <u>an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful</u>; and
> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time[.]   [Emphasis added.]

In this case, DFS prepared and executed a treatment plan; however, P.D. refused to sign the plan. The treatment plan was filed with the District Court, but was never officially signed by the District Judge.

While the District Court never approved the treatment plan, all parties involved apparently proceeded under the assumption that there was a court-approved treatment plan in place. In a Request for Status Report on Service Treatment Agreement, P.D.'s counsel stated:

> 2. It is the understanding of your Petitioner that a service treatment agreement was presented to [P.D.] in that she has either the original or a copy of such document. And apparently a duplicate original of the agreement was signed by the DFS, [P.D.], <u>and later approved by the Court</u>.

8

3. [P.D.] believes that she has successfully completed nearly all of the requirements of the service treatment agreement. [Emphasis added.]

P.D. and her counsel clearly believed that a court-approved treatment plan was in place and that she was required to comply with the terms of this treatment plan. A review of the record reveals that P.D. failed to complete the requirements of the treatment plan which she believed governed these proceedings.

P.D. now argues on appeal that the court cannot terminate her parental rights because it did not first approve a treatment plan. P.D. claims that without a court-approved treatment plan in place, her parental rights cannot be terminated under any circumstances.

This Court has consistently interpreted abuse and neglect statutes to protect the best interest of the children. "In matters involving abused and neglected children we have consistently held that a district court may protect the children's best interest despite procedural error." In the Matter of F.H., J.K. and B.K., Youths in Need of Care (1994), 266 Mont. 36, 39, 878 P.2d 890, 892.

We have upheld the termination of parental rights absent a court-approved treatment plan. In the Matter of the Custody and Parental Rights of M.D., a/k/a/ M.S., a Youth in Need of Care (1993), 262 Mont. 183, 864 P.2d 783. In that case, the parent was incarcerated, refused to complete the recommended sexual offender program and refused to sign the proposed treatment plan. In the Matter of the Custody of M.D., 864 P.2d at 786. We held that court approval of the treatment plan was not necessary due to the parent's incarceration and noncompliance with the treatment

9

recommendations. In the Matter of the Custody of M.D., 864 P.2d at 786-87.

While P.D. was not incarcerated, she refused to sign the treatment plan and refused to fulfill the requirements contained therein. In light of our decision in In the Matter of the Custody of M.D., and the facts and circumstances of this case, we conclude that the absence of formal court approval of the treatment plan is not a bar to terminating P.D.'s parental rights.

We note, for future termination proceedings, that a court-approved treatment plan should be in place in every case except as specifically provided in § 41-3-609(4), MCA. To clarify any confusion caused by our previous opinions, we observe that § 41-3-609, MCA, does not require that the parent sign the treatment plan in order for the court to approve such a plan. Section 41-3-609, MCA, allows court approval of a treatment plan with or without the parent's signature. We also reiterate our warning to DPHHS to abide by the strict statutory requirements in termination proceedings or risk grave harm to the very children whom they seek to protect. See In the Matter of F.H., 878 P.2d at 890.

We affirm the decision of the District Court.

Chief Justice

10

We concur:

_____

_____
William E Hunter

_____
Terry Trieweiler
Justices

Justice Charles E. Erdmann specially concurring.

While I have joined the majority opinion, it was with some reluctance. Justice Gray, in her dissent, reviews the statutory requirements of § 41-3-609(1)(c), MCA, and the obvious fact that those requirements were not met in this case since there was no court approved treatment plan. In determining that this error does not warrant reversal, the majority relies on In the Matter of F.H. (1994), 266 Mont. 36, 878 P.2d 890, in which this Court held that a district court may protect the children's best interests despite procedural errors. Justice Gray dissented in In the Matter of F.H. on the same basis that she does here, noting that repeated "signals" from this Court had gone unheeded by DFS (now DFHHS). I share those concerns.

The Legislature has established certain procedures that must be followed in terminating parental rights. Although the Legislature did not adopt an exception allowing district courts to disregard procedural requirements if the best interests of the children are involved, this Court has done so. The existence of this Court-created exception to the statutory requirements has the effect of tolerating if not condoning improper procedures.

I have joined with the majority only because the actions taken by DFS in this case occurred prior to the issuance of In the Matter of F.H. on July 12, 1994. DFS did not have the benefit of reviewing the cautions contained in Justice Gray's dissent and Justice Nelson's concurring opinion in that case prior to filing the petition in this matter.

12

The difficulty in this area, and no doubt the reason for the creation of the exception in In the Matter of F.H., is that the very children DFHHS is charged to protect are endangered when these cases are reversed or remanded. With the continuation of this judicially-created exception, however, there is little incentive for DFHHS to comply with the statutory requirements.

DFHHS should heed the warning contained in both the majority and dissenting opinions or risk reversal on the basis of procedural errors in the future.

_____
Justice

13

Justice Karla M. Gray, dissenting.


I respectfully dissent from the Court's opinion because I will not be a party to the Court's continued refusal to require DFS (now DPHHS) to comply with clear legislative mandates. I would reverse the District Court's termination of P.D.'s parental rights without a court-approved treatment plan because the law permits no other result in this case.

The dispositive issue in this case is simple and to the point. It requires only that we apply the plain language of § 41-3-609(1)(c), MCA, to the record before us. Neither this Court's refusal to address the statute in discussing issue 4, regarding the absence of a court-approved treatment plan, nor the Court's repeated efforts to misdirect attention away from clear and mandatory statutory language alter the requirement of a court-approved treatment plan contained in the statute.

Section 41-3-609(1)(c), MCA, authorizes a court to terminate parental rights upon a finding that the child is an adjudicated youth in need of care "and both of the following exist:"

> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time. [Emphasis added.]

A straightforward reading of the statute can result only in a conclusion that the threshold mandate of the remaining criteria in § 41-3-609(1)(c)(i) and (ii), MCA, is the existence of a court-approved appropriate treatment plan. Unless and until such a plan

14

exists, the "no compliance/not successful" and "unlikely to change" criteria never come into play. The legislature's intent and the rationale underlying that intent are clear: a parent's conduct in successfully complying can be measured only against an appropriate treatment plan that has been approved by the court.

In this case, the record is equally clear. No appropriate treatment plan approved by the District Court exists. Thus, the law permits only one valid legal conclusion by this Court: that the District Court erred in terminating P.D.'s parental rights. In concluding otherwise, this Court violates the statutory responsibility imposed on it by § 1-2-101, MCA, by judicially deleting from § 41-3-609(1)(c), MCA, the requirement of a court-approved plan clearly contained therein. In doing so, of course, the Court intrudes into and directly contravenes the legislature's constitutional authority.

In charting such a course, the Court presents a number of "red herrings," apparently hoping to draw the reader's attention away from what the law so clearly requires. First, the Court notes that P.D. refused to sign the plan. The problem with this statement is that the statute does not require that the parent do so. Next, the Court observes that the plan was filed with the District Court, but not "officially signed" by that court. By means of this observation, the Court attempts to suggest that the District Court's "official signing" of the plan is a mere ministerial act and is all that § 41-3-609(1)(c)(i), MCA, requires or contemplates. Nothing could be farther from the truth.

15

The legislature's mandate that the treatment plan filed by DFS be approved by a court is neither ministerial nor nonsubstantive. The legislature recognized throughout the statutes regarding termination of parental rights that, while DFS is the state agency in which initial decisions regarding the protection of children is vested, DFS cannot be permitted to act in these important areas without court involvement. Thus, the treatment plan promulgated by DFS--whether or not agreed to by the parent(s) involved--must be reviewed by a court to determine whether it is appropriate; if so, it must be affirmatively approved by the court. The statutory requirement is a clear statement of legislative intent that the court's role is not to merely "rubber stamp" agency decision-making by "officially signing" DFS' treatment plan; the court's role is to ensure that the agency is not given unbridled discretion in areas as important as terminating the most fundamental relationship in the world--that of parent and child.

But this Court does not stop with these two efforts to detract attention from its failure to apply clear statutory language. It goes on at some length to point out that, during some phases of the proceedings, all parties operated under the mistaken belief that a court-approved treatment plan existed and that P.D. "failed to complete the requirements of the treatment plan which she believed governed these proceedings." These matters are irrelevant here.

What this Court fails to point out is that this case does not involve the parties' "belief" regarding existence of a court-approved plan throughout the proceedings in the District Court. In

16

such a case, the parent would have waived any right to later challenge the outcome on that basis; if raised in this Court, we would not address the issue because it had not been preserved in the District Court and would not be properly before us. In fact, the record in this case is clear that P.D. did object to the absence of a court-approved treatment plan in the District Court.

Nor is the fact that P.D. failed to complete the requirements of the treatment plan she believed existed during earlier phases of the District Court proceedings pertinent here. As a matter of law, no statutorily-required court-approved treatment plan existed against which her conduct could be measured as to compliance and success.

Finally, by citing to In the Matter of F.H., J.K. and B.K. and In the Matter of the Custody of M.D., the Court seems to herald and celebrate its now nearly two-decade old refusal to apply the law as enacted by the legislature and its concomitant permission to DFS to ignore the law. While it is true that the Court ends its opinion with a tepid shaking of its collective finger at DFS via a "reiteration" of a long-standing "warning" to DFS--and, perhaps, to the district courts of Montana--neither the agency nor attorneys nor district courts are likely to take this "warning" any more seriously than they have taken the previous warnings. And why should they? With the addition of every opinion from this Court in which an agency of the State of Montana is allowed to avoid legal mandates, it becomes harder and harder for the Court to break away from this ill-chosen and insupportable path, because in every "next

17

case" agency lawyers will argue that it is not fair that clear legal requirements should finally be applied as written in their case. And so the Court continues to allow a state agency to blithely ignore the law with impunity.

It is important to look back at the cases in which this Court has "warned" DFS and its predecessor agency that it must comply with legal mandates. As early as 1977, this Court "strongly condemned" DFS' disregard of the law. In re Gore (1977), 174 Mont. 321, 329, 570 P.2d 1110, 1115. In that case, SRS (DFS' predecessor agency with regard to protecting children) ignored a legislatively-imposed 48-hour filing requirement for an emergency protective services petition after removing children from a home. We noted that SRS had removed the children under the guise of the law and that it had a duty to "strictly adhere to the requirements of that same law." In re Gore, 570 P.2d at 1115.

Seventeen years later, in one of the cases to which the Court cites in its opinion here, we said we "sound a stern warning to DFS to strictly follow the statutory procedure in future cases or we will, in no uncertain terms, punish its conduct . . . ." Matter of F.H. (1994), 266 Mont. 36, 40, 878 P.2d 890, 893. One can hardly say that DFS has heeded our strong condemnation and stern warning! Of at least equal importance, one can hardly say that in this case the Court is, "in no uncertain terms," punishing DFS' continued refusal to comply with the very law under which it operates! I dissented strongly in Matter of F.H. for the same reasons I dissent here: the Court's actions in these regards are not permitted as a

18

matter of law and serve only to encourage DFS--and others--to ignore both the law and this Court.

Finally, the Court's reliance on Matter of Custody of M.D., is misplaced. In that case, as in this one, no court-approved treatment plan existed. The incarcerated parent argued that his parental rights could not be terminated. We disagreed, because § 41-3-609(4)(b), MCA, provides that a court-approved treatment plan is not required if the court finds that "the parent is incarcerated for more than 1 year and such treatment plan is not practical considering the incarceration[.]" Matter of Custody of M.D. (1993), 262 Mont. 183, 186, 864 P.2d 783, 786.

In Matter of Custody of M.D., a specific statutory exception to the court-approved treatment plan existed and was properly applied to the facts of record. Here, P.D. was not incarcerated. As a result, neither Matter of Custody of M.D. nor the statutory exception upon which we relied there applies to the present case.

I share the Court's concern about the children of Montana. Indeed, there is room for concern about returning P.D.'s children to her pending a District Court proceeding in which DFS is required to follow the law. The appropriate resolution of this case is not for this Court to continue to countenance the violation of the law by DFS. The appropriate resolution is to reverse the District Court and order that the status quo regarding the children be maintained pending further proceedings during which legal mandates are met. I would remand for the filing by DFS (now DPHHS), within 30 days, of an appropriate treatment plan for the District Court's

19

timely consideration and for such other procedures and proceedings as the law requires thereafter.

_____
Justice

Justice W. William Leaphart joins in the foregoing dissent of Justice Karla M. Gray.

_____
Justice

Justice James C. Nelson, dissenting.

I join Justice Gray in her dissent. She was correct in dissenting in Matter of F.H., and she is correct in her analysis and dissent here. While agreeing with her dissent in Matter of F.H., I nevertheless signed the Court's opinion in the hope -- misplaced, as it turns out -- that, perhaps, a further warning to DFS (DPHHS) would suffice. It has not; and, for me, at least, this case is the straw that broke the camel's back.

While Justice Erdmann points out that Matter of F.H. was issued subsequently to DPHHS' actions here, nevertheless the District Court's Findings of Fact and Conclusions of Law were entered over two months *after* our opinion in that case. Accordingly, DPHHS' failure to comply with § 41-3-609(1)(c), MCA, could have and should have been addressed at that point in time by denying the petition to terminate P.D.'s parental rights and, instead, requiring compliance with the statute.

_____
Justice

20