DA 07-0038

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 216

IN RE THE MATTER OF

K.J.B.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADJ 2005-235-Y(c)
Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

    For Appellant Father:

        Jim Wheelis, Chief Appellate Defender, Joslyn M. Hunt,
Assistant Appellate Defender, Helena, Montana

    For Appellant Mother:

        Sunday Z. Rossberg, Rossberg Law Office, LLC, Great Falls, Montana

    For Respondent:

        Hon. Mike McGrath, Montana Attorney General, C. Mark Fowler,
Assistant Attorney General, Helena, Montana

        Brant Light, Cascade County Attorney, Sarah Corbally,
Deputy County Attorney, Great Falls, Montana

Submitted on Briefs:  July 3, 2007

Decided:  September 5, 2007

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 The parents of K.J.B. appeal the Eighth Judicial District Court's Order terminating their parental rights to the child. We affirm.

## ISSUE

¶2 While the parents present multiple issues on appeal, the dispositive issue is whether the District Court abused its discretion in terminating J.B.'s and C.B.'s parental rights to K.J.B.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 J.B. and C.B. II (hereinafter C.B.) are the natural parents of five living children born between 1995 and 2005: C.B. III, A.B., C.B. V, T.B. and K.J.B. In addition, a sixth child, C.B. IV, was delivered stillborn during these years. J.B., the children's mother, suffers from a chromosomal abnormality known as velocardiofacial syndrome (VCFS). VCFS causes physical and cognitive difficulties and developmental delays. Among others symptoms it can manifest in heart defects, cleft palate, curved esophagus, hearing and speech impairment, bowel problems, and poor muscle tone. As a result of VCFS, J.B. is mentally impaired with limited intellectual capacity. Each of J.B.'s children was born with VCFS. As the previous termination proceedings involving these parents were judicially noticed by the District Court at the adjudicatory hearing stage of these proceedings and are critical to our ruling, we provide the necessary details of those proceedings below.

*Termination of Rights to C.B. III*

2

¶4    C.B. III was born in May 1995. In August 1995, while the child was in the Deaconess Hospital in Great Falls, the Montana Department of Public Health and Human Services, Child and Family Services Division (DPHHS), filed for temporary investigative authority, protective services, temporary custody, and for adjudication that C.B. III, was a youth in need of care. C.B. III suffered each of the above-listed manifestations of VCFS. His curved esophagus created feeding difficulties which required that he be fed with a feeding tube. Additionally, for the first several months of his life, he was required to be on oxygen at all times. His doctors speculated that he would need physical, speech and occupational therapy, in addition to on-going medical treatments, and that his intellectual capacity would be limited.

¶5    One of C.B. III's doctors indicated that when the child was first born, the parents seemed to be involved in his care and rarely missed a scheduled doctor's appointment. In a short amount of time, however, their commitment to the effort waned and they began to miss appointments. As a result of his parents' inability to adequately care for him, C.B. III was placed in foster care in early October 1995 upon his release from a two-month hospital stay. J.B. and C.B. stipulated, with assistance of counsel, to adjudication that C.B. III was a youth in need of care and agreed to DPHHS having temporary custody. Beginning in October 1995 DPHHS provided a therapist to work with J.B. and C.B. to assess their needs and assist in teaching them how to care for their special needs child. The therapist, after observing personality issues, cognitive impairment and paranoia exhibited by the parents, suggested that J.B. and C.B. undergo psychological evaluations, the results of which would allow the Department to better tailor the parents' treatment

plans to their needs and abilities. J.B. and C.B. refused to undergo the evaluations.[1] As a result, they ultimately signed treatment plans that did not consider or address their specific needs. The Plans were approved by the Lewis and Clark County District Court in December 1995.

¶6 During the course of assistance provided by DPHHS, the therapist noted that the parents consistently failed to physically interact with C.B. III, touching or holding him only when prompted to do so. They also were unable to understand how to feed C.B. III with a feeding tube and could not consistently diaper him properly. Because the parents could not master these two necessary basic activities, the therapist was unable to move on to other child care requirements such as bathing C.B. III. Despite being told that cigarette smoke was considered risky to C.B. III's health, J.B. and C.B. refused to stop smoking when DPHHS brought C.B. III to their home for visits. The Department therefore moved the visits to another location, and J.B. and C.B. responded by refusing to attend visits outside of their own home. By this time, the parents rarely attended C.B. III's medical appointments.

¶7 In June 1996 DPHHS filed a petition to terminate J.B.'s and C.B.'s parental rights on the ground that the parents had not complied with the provisions of the treatment plan. Specifically, J.B. and C.B. had failed to participate in the majority of scheduled visits with C.B. III or attend his doctor appointments, they had refused to undergo the Plan-

---

[1] A neuro-psychological evaluation performed on C.B. during subsequent termination proceedings indicated that C.B. is severely handicapped with marginal intellectual ability and schizoid personality disorder manifesting in little ability to identify and respond to the emotional state of another person, especially in the absence of verbal cues.

4

required psychological evaluations, J.B. failed to seek Plan-prescribed prenatal care during her pregnancy with C.B. IV resulting in the child's still birth, and the couple failed to maintain a stable residence.

¶8     A hearing was held on the Department's termination petition in August 1996. Counsel for the parents appeared but J.B. and C.B. did not, having moved from Montana and leaving no forwarding address. The First Judicial District Court for Lewis and Clark County terminated their parental rights.

*Termination of Rights to C.B. V and A.B.*

¶9     By August 1999, J.B. and C.B. had returned to Montana and C.B. V and A.B. had been born, both with VCFS. At that time both children were adjudicated youths in need of care by the Second Judicial District Court for Silver Bow County, and in January 2000 J.B.'s and C.B.'s parental rights to these children were terminated. C.B. and counsel for both C.B. and J.B. attended the hearing but J.B. did not. The Silver Bow court took judicial notice of the previous involuntary termination and stated that the circumstances surrounding the abuse and neglect of C.B. III were related to the termination of rights to C.B. V and A.B. Specifically, the court noted that J.B. failed to complete a psychological evaluation, both parents failed to maintain a stable residence, J.B. did not have adequate prenatal care with respect to her pregnancy with C.B. V, both parents failed to provide adequate and timely medical care for A.B., J.B. failed to obtain medical care and monitoring of her medical situation on a timely and constant basis, and they left both children with care providers without making arrangements for food, clothing, or advising when they would return for the children. Additionally, J.B. told the DPHHS social

5

worker that she did not wish contact with her children and wanted to relinquish her parental rights. As described above, C.B. underwent a neuro-psychological evaluation which indicated that his severe intellectual and personality handicaps were developmental and irreversible. The doctor testified that C.B. could not meet the minimum criteria for providing for the needs of his handicapped children.

*Termination of Rights to T.B.*

¶10 Subsequently T.B. was born, also with VCFS, and was placed in emergency protective custody on April 16, 2003, one day after her birth. On May 6, 2003, J.B. and C.B. were appointed counsel, and on May 21, 2003, T.B. was adjudicated a youth in need of care. The Eighth Judicial District Court for Cascade County acknowledged the previous terminations and found that J.B. and C.B. continued to be unable or unwilling to provide the child with the special care she required. The court noted that C.B. ignored medical advice regarding T.B.'s feeding requirements, insisting that a feeding tube was unnecessary despite being specifically ordered by T.B.'s doctors. In December 2003 the court terminated the parents' rights to T.B.

*The Instant Case—Termination of Rights to K.J.B.*

¶11 On October 5, 2005, K.J.B. was born, also with VCFS, and was placed into emergency protective custody on October 7, 2005. An adjudicatory hearing was held on December 6, 2005, and both parents were present with their court-appointed attorneys. The court adjudicated K.J.B. a youth in need of care and set a dispositional hearing for January 2006. After the adjudicatory hearing, psychological evaluations for J.B. and C.B. were scheduled to determine whether the previous four involuntary terminations

6

were relevant to their ability to adequately parent K.J.B. within a reasonable amount of time and to determine whether DPHHS should provide the parents with a treatment plan.

¶12 The dispositional hearing was continued twice because the psychological evaluations of the parents could not be completed within the normal time frame as the parents required more than the normal amount of time to complete the testing. The evaluation results were provided to the attorneys for the parents shortly before the dispositional hearing scheduled for April 4, 2006. The attorneys requested a continuance to have more time to review the evaluation results and the additional time was granted.

¶13 At the April 25, 2006, scheduled hearing, DPHHS requested that the court find that reasonable efforts to reunify the parents with K.J.B. were not required pursuant to § 41-3-423(2)(e), MCA, as the parents had their parental rights to the child's siblings involuntarily terminated and the circumstances related to the previous terminations were relevant to the parents' ability to adequately care for K.J.B. At the same hearing, attorneys for the parents requested a 60-day continuance to allow their clients to undergo independent psychological evaluations and parenting assessments. The Department did not object to the parents seeking independent evaluations but indicated that it would be filing a termination petition before the 60 days had lapsed. DPHHS explained that the factual basis for its petition to terminate was identical to the factual and statutory basis for its request that the court find that reasonable efforts for reunification were not necessary. The court therefore ordered that the termination petition be filed before the dispositional hearing rescheduled for June 27, 2006, at which time a consolidated

7

dispositional/termination hearing would be held. DPHHS filed the Petition for Permanent Legal Custody and Termination of Parental Rights on May 18, 2006.

¶14 The June 2006 dispositional hearing was continued numerous times, primarily at the parents' requests, and ultimately commenced on November 14, 2006. Dr. Donna Zook, the psychologist who performed the evaluations of J.B. and C.B. testified as did K.J.B.'s pediatrician, Dr. Nora Gerrity.

¶15 Dr. Zook testified that based on her evaluations she did not believe either parent could learn to adequately parent K.J.B. within a reasonable amount of time due to their lack of insight and/or acknowledgment of their past parenting problems with their other children. She explained that while many of the tests she performed on each parent were characterized as "invalid" and unable to be scored, she nonetheless was able to interpret the test results and produce a valid psychological evaluation. She explained that J.B. was unrealistic and did not admit to any problems she had that could affect her parenting. Dr. Zook noted that J.B. presented in a way that indicated that she deferred parenting responsibilities to C.B. Additionally, Dr. Zook concluded that J.B. expected the child to give her emotional satisfaction and attend to her needs, rather than J.B. providing these things to her child. As for C.B., the doctor opined that he was emotionally distant, emotionally disconnected from K.J.B., unable to develop insight or understanding, and that his perception of his life was inconsistent with the actuality of his life. She observed that he perceived himself to be a "perfect parent" without any problems but with the right to "have my kid back because a parent has a right to raise the kid any way they want." Moreover, she testified that she had concerns about C.B.'s judgment in that he reported

8

that he was prescribed medication but could not tell her what kind of medication or the dosage and admitted that he was not taking it because he had not had it refilled. Dr. Zook concluded that his denial of faults and problems was pervasive, intense and chronic and could not be treated in a reasonable amount of time.

¶16 Dr. Gerrity testified that she had been K.J.B.'s pediatrician since the child's birth and had diagnosed K.J.B. with VCFS. She stated that while the child was still quite young at the time of the hearing (one year and one month), she was smaller than normal, was microcephalic[2], and had impaired hearing and delayed motor skills. She explained that feeding K.J.B. was very difficult and required a "good parenting situation" because proper feeding would allow her to grow to her maximum potential but due to the VCFS she would not reach "full stature." The doctor surmised that K.J.B. needed to begin therapy for her motor and physical disabilities as well as speech immediately and that she would need to continue these therapies indefinitely. She posited that over time K.J.B.'s needs would shift from primarily medical to medical and educational with the need for special schooling, such as the School of Deaf and Blind, and intense intellectual stimulation, a difficult task for caregivers of a hearing impaired child. She testified that K.J.B. would need ongoing upgrades of her hearing aid devices. Dr. Gerrity emphasized that the services and the work of specialists that can be provided during K.J.B.'s early years would help her improve her functionality in years to come. She also testified that

---

[2] Dr. Gerrity explained that not every VCFS child is microcephalic. She opined that she is more concerned about K.J.B.'s "overall intellectual functioning" than she would be were K.J.B. not microcephalic. She also noted that K.J.B.'s head circumference is not only "not paralleling" a normal curve, but is "falling off."

9

"the people that spend the most time with [a] child like this create the most positive or the most negative, because it's everything you do—is every minute of every day that can be a stimulating environment for the child to learn, and reach out, and to accomplish things." She opined that many parents or caregivers of VCFS children have this ability to engage and provide a constant stimulating environment instinctively but it is very difficult to teach those who do not.

¶17 At the close of Dr. Gerrity's testimony, the hearing was continued to December 12, 2006, at which time Lee Smith, the DPHHS social worker, Carol Sears, a DPHHS case aide, and Gerri Labunetz, the project coordinator for Healthy Mothers/Healthy Babies, testified.

¶18 Smith testified that he had met with the parents approximately twenty times between K.J.B.'s birth and the termination hearing and had observed them for brief periods of time during three to five visits with K.J.B. He believed it was in K.J.B.'s best interests to have her parents' rights terminated and allow her to be adopted. At the time of the December 2006 hearing K.J.B. had been in foster care for fourteen months with the family who had adopted two of her siblings and wished to adopt her. Smith stated that this family had the compassion, experience and ability to care for the special needs of VCFS children. Smith explained that he petitioned for emergency protective services at the time of K.J.B.'s birth and was seeking termination based on J.B.'s and C.B.'s previous involuntary terminations.

¶19 Carol Sears, a case aide assigned to supervise visits between the parents and K.J.B., testified that J.B. had problems changing K.J.B.'s diaper and dressing her. She

10

also observed that, during K.J.B.'s infancy, the parents would not hold her for more than two or three minutes before passing her to the other parent who in turn held her for two or three minutes before passing her back again. As K.J.B. got a little older, they would place her on a blanket with toys but would not interact with her or touch or hold her until she got fussy. She pointed out that the parents had missed numerous scheduled visitations with K.J.B.—J.B. attended eight of the final thirty-two scheduled visits and C.B. attended sixteen of the final thirty-two visits. Sears acknowledged that she never had to stop a visit out of concern for the child's safety.

¶20 Gerri Labunetz frequently conducts parenting inventories at the request of DPHHS and she conducted such an inventory on J.B. Based on her responses to the inventory questions, J.B. achieved three "at-risk" scores and two "average" scores. Labunetz stated that a parent's scores may improve as they gain confidence in their skills and feel good about their relationship with their child. She explained that J.B. achieved an "average" score on the nurturing quiz which indicated that "she has the knowledge of the skills" but it "does not necessarily indicate that she can carry them out." She testified that if J.B. succeeded in learning "how to hold the baby, how to bathe the baby, how to dress a baby, how to keep a baby safe, how to play with a baby," she could then participate in a program that would help her understand a child's development and provide her with exercises under which "she would be constantly working on maintaining the child's potential for growth and development." Labunetz opined that J.B. "would definitely need a lot of support to parent [K.J.B.], particularly with her needs."

¶21 At the conclusion of the hearing, the District Court granted the Department's petition to terminate finding that K.J.B. was a special needs child, that J.B. and C.B. were unable to adequately care for such a child and that no satisfactory services were available that could enable the parents to adequately parent K.J.B. within a reasonable time. In the court's subsequent written Order, it recounted portions of the testimonies of Zook, Labunetz, Gerrity and Sears to which it apparently attributed significant weight. The court also found that the circumstances related to the four previous involuntary terminations of parental rights of J.B. and C.B. were relevant to their ability to adequately care for K.J.B. The court determined that it was in K.J.B.'s best interests to terminate the parental rights of J.B. and C.B. and it was authorized to do so under § 41-3-423(2), MCA. J.B. and C.B. appeal the District Court's termination of their parental rights to K.J.B.

## STANDARD OF REVIEW

¶22 We review a district court's decision to terminate parental rights to determine whether the court abused its discretion. The test for an abuse of discretion is "whether the trial court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice." However, because a parent's right to the care and custody of a child is a fundamental liberty interest, it must be protected by fundamentally fair procedures. *In re V.F.A.*, 2005 MT 76, ¶ 6, 326 Mont. 383, ¶ 6, 109 P.3d 749, ¶ 6 (internal citations omitted).

¶23 To satisfy the relevant statutory requirements for terminating a parent-child relationship, a district court must make specific factual findings. We review those findings of fact to determine whether they are clearly erroneous. It is well established

12

that in reviewing a district court's findings, this Court does not consider whether the evidence could support a different finding; nor does it substitute its judgment for that of the fact-finder regarding the weight given to the evidence. *In re D.V.*, 2003 MT 160, ¶ 23, 316 Mont. 282, ¶ 23, 70 P.3d 1253, ¶ 23 (citation omitted). It is the district court's responsibility to weigh the evidence presented and ascertain witnesses' corresponding credibility. *In re K.S.*, 2003 MT 212, ¶ 20, 317 Mont. 88, ¶ 20, 75 P.3d 325, ¶ 20. Lastly, we review the court's conclusions of law to determine whether the court interpreted the law correctly. *V.F.A.*, ¶ 7.

¶24    The district court is bound to give primary consideration to the physical, mental and emotional conditions and needs of the children. Consequently, the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights. Section 41-3-609(3), MCA. Moreover, the party seeking to terminate parental rights must demonstrate by clear and convincing evidence that the statutory requirements for termination have been met. *V.F.A.*, ¶ 8 (citation omitted).

**DISCUSSION**

¶25    Sections 41-3-601–612, MCA, provide for termination of the parent-child relationship. Section 41-3-602, MCA, states the purpose:

> This part provides procedures and criteria by which the parent-child legal relationship may be terminated by a court if the relationship is not in the best interest of the child. The termination of the parent-child legal relationship provided for in this part is to be used in those situations when there is a determination that a child is abused or neglected, as defined in 41-3-102.

13

¶26 Relevant definitions are found in §§ 41-3-102(3) and (7), MCA:

(3) "Abused or neglected" means the state or condition of a child who has suffered child abuse or neglect.
(7) (a) "Child abuse or neglect" means:
(i) actual physical or psychological harm to a child;
(ii) substantial risk of physical or psychological harm to a child; or
(iii) abandonment.

¶27 To terminate a parent-child relationship, a district court must determine that one of the criteria in § 41-3-609, MCA, exists. *V.F.A.*, ¶ 12. Sections 41-3-609(1)(d), MCA, is relevant to this case and provides:

(1) The court may order a termination of the parent-child legal relationship upon a finding . . . that any of the following circumstances exist:
(d) the parent has subjected a child to any of the circumstances listed in 41-3-423(2)(a) through (2)(e).

¶28 Section 41-3-423(2)(e), MCA, provides:

(2) Except in a proceeding subject to the federal Indian Child Welfare Act, the department may, at any time during an abuse and neglect proceeding, make a request for a determination that preservation or reunification services need not be provided. . . . A court may make a finding that the department need not make reasonable efforts to provide preservation or reunification services if the court finds that the parent has:
(e) had parental rights to the child's sibling or other child of the parent involuntarily terminated and the circumstances related to the termination of parental rights are relevant to the parent's ability to adequately care for the child at issue.

¶29 In summary, for the District Court to terminate the parental rights of J.B. and C.B. under § 41-3-609(1)(d), MCA, the court had to "determine" that K.J.B. was at substantial risk of physical or psychological harm. (Sections 41-3-602, MCA, 41-3-102(3) and (7)(a)(ii), MCA.) After such a determination was made, the court was authorized to terminate their parental rights if it was established by clear and convincing evidence that

14

J.B. and C.B. had had their parental rights to K.J.B.'s sibling or siblings involuntarily terminated (Sections 41-3-609(1)(d), MCA, 41-3-423(2)(e), MCA), and the circumstances related to those involuntary terminations were relevant to their ability to adequately care for K.J.B. (Sections 41-3-609(1)(d), MCA, 41-3-423(2)(e), MCA.) Moreover, the District Court had to give primary consideration to K.J.B.'s physical, mental and emotional conditions and needs, placing K.J.B.'s best interests over J.B.'s and C.B.'s parental rights. *V.F.A.*, ¶ 8.

¶30 As stated above, the District Court held an adjudicatory hearing on December 6, 2005, and adjudicated the child a "youth in need of care." The parents challenge the court's Order arguing that it did not contain the level of specificity required by §§ 41-3-437(2) and (7)(a), MCA[3]. Among other things, the parents complain that the court's findings did not expressly state that "either parent posed a 'substantial risk of physical or psychological harm to [the] child.' " Without express findings relative to the nature of the abuse or neglect suffered by K.J.B., the parents assert she could not properly be designated a youth in need care. Without such designation, the parents maintain, the District Court could not terminate their parental rights.

---

[3] Section 41-3-437(2), MCA, requires, in relevant part: The court may make an adjudication on a petition under 41-3-422 if the court determines by a preponderance of the evidence . . . that the child is a youth in need of care. . . . Adjudication must determine the nature of the abuse and neglect and establish facts that resulted in state intervention and upon which disposition, case work, court review, and possible termination are based.

Section 41-3-437(7)(a), MCA, states: Before making an adjudication, the court may make oral findings, and following the adjudicatory hearing, the court shall make written findings on issues, including but not limited to the following: (i) which allegations of the petition have been proved or admitted, if any; (ii) whether there is a legal basis for continued court and department intervention; and (iii) whether the department has made reasonable efforts to avoid protective placement of the child or to make it possible to safely return the child to the child's home.

15

¶31 The parents' assertions might arguably be correct if termination was being sought under § 41-3-609(1)(f), MCA. Section 41-3-609(1), MCA, provides multiple circumstances under which a court is authorized to terminate a parent's right to a child, only one of which requires adjudication of the child as a youth in need of care—§ 41-3-609(1)(f), MCA. All other circumstances described in §§ 41-3-609(1)(a)-(e), MCA, require a "determination" that the child is abused or neglected. In the case before us, DPHHS alleged in its initial Petition for Emergency Protective Services, Adjudication as Youths [sic] in Need of Care, and Temporary Legal Custody that probable cause existed to believe that K.J.B. was "abused or neglected," as defined by the relevant statute, by reason of her parents' previously-established inability to care for their other special needs children and the State's involuntary termination of their parental rights to all four of those children. In social worker Smith's affidavit attached to the initial petition, he described in detail the medical conditions and the special needs of all of J.B.'s and C.B.'s children, including K.J.B. He described the physical, mental, emotional and intellectual limitations of J.B. and C.B. and the reasons three different district courts in Montana concluded they were unable or unwilling to care for their children in the manner the children required. Smith described the efforts taken by the Department to help the parents learn the necessary parenting skills and their inability and failure to do so. He unequivocally stated, "Due to the extensive history of this family, no efforts could be made to ensure that [K.J.B.] would be safe in the care of her parents."

¶32 Smith testified in even greater detail at the adjudicatory hearing at which the District Court took judicial notice of the previous termination cases. At the conclusion of

16

the hearing, the District Court judge stated, "The [c]ourt finds that based on that sufficient evidence I conclude that the child is in danger of being abused and neglected and therefore a youth in need of care." In the District Court's subsequent Order, it specifically found that K.J.B.'s best interests were served by continued out-of-home placement; that she was a youth in need of care as defined by § 41-3-102, MCA[4]; that the parents' rights to their previous children were terminated due to their long term and ongoing inability to safely parent the children; that dismissing the petition would create an ongoing risk of "abuse and/or neglect" to K.J.B; and that custody of K.J.B. with her parents would likely result in a risk of continued abuse and/or neglect and removal was necessary to protect the child. We conclude the District Court's repeated language serves as an adequate "determination" that K.J.B. was at "substantial risk of physical or psychological harm" by "acts or omissions of a person responsible for the child's welfare." Sections 41-3-102(7)(a)(ii) and (b)(i)(A), MCA.

¶33 In *In re M.J.W.*, 1998 MT 142, 289 Mont. 232, 961 P.2d 105, we explained that § 41-3-609(1)(b), a "sister" provision to § 41-3-609(1)(d), MCA, upon which the case before us relies, is a provision for termination that does not require a youth in need of care adjudication but rather a determination of "abused or neglected." In that case we held that the court "implicitly" determined the child was "abused and neglected" upon a determination that the child was abandoned. See also *In re T.H.*, 2005 MT 237, 328 Mont. 428, 121 P.3d 541. However, in the case before us, the District Court repeatedly

---

[4] "Youth in need of care" means a youth who has been adjudicated or determined, after a hearing, to be or to have been abused, neglected, or abandoned. Section 41-3-102(34), MCA.

17

and expressly, rather than implicitly, characterized K.J.B. as a child at risk for ongoing or continued abuse and/or neglect.

¶34 Having concluded that the District Court adequately "determined" that K.J.B. was at risk of abuse or neglect, we turn to the other requirements for termination under § 41-3-609(1)(d), MCA—previous involuntary terminations and relevancy thereof to the current proceeding. It is undisputed that the parents have been subject to four previous involuntary terminations of parental rights to their other four children; therefore, we need only determine whether the District Court correctly concluded that the "circumstances related to the termination of parental rights are relevant to the parent's ability to adequately care for the child at issue." Section 41-3-423(2)(e), MCA.

¶35 C.B. argues on appeal that the psychological evaluation from two years ago was "stale" and irrelevant" and claims, without elaboration or reasoning, that it is possible that he now functions at a level that would allow him to parent K.J.B. However, J.B.'s and C.B.'s primary argument seems to be not that their circumstances related to the previous terminations have changed, but rather that the District Court's Order lacked specificity in that it "failed to reference what circumstances of the previous terminations are relevant to J.B.'s [and C.B.'s] ability to care for K.J.B." Additionally, J.B. asserts that the District Court improperly shifted from the Department to the parents the burden of demonstrating by clear and convincing evidence that the previous termination circumstances were relevant.

¶36 Our review of the record convinces us that DPHHS met its burden of establishing that J.B. and C.B. remain unable to safely and adequately address K.J.B.'s special needs

18

and provide for her necessary care and that the court did not improperly shift the burden. In this respect, their circumstances are unchanged from the circumstances surrounding and underlying their previous parental terminations. The District Court heard extensive testimony from numerous professionals who have worked with, observed or evaluated the parents including the DPHHS-assigned social worker, the DPHHS case aide, K.J.B.'s pediatrician, a psychologist who conducted multiple tests and evaluations of both parents, and the project coordinator for an organization specifically designed to strengthen families and assist families and children in need of intervention. As noted above, the court's termination Order specifically referenced as findings of fact the witness testimony upon which it based its conclusions of law. These witnesses competently described K.J.B.'s current and future extensive needs to address her physical and intellectual growth and well-being. The psychological evaluations of J.B. and C.B., while not including an observation of them with K.J.B., nonetheless informed the court that their physical, mental, emotional and intellectual circumstances had changed little, if at all, during the two years since termination of their parental rights to T.B. The previous termination orders also indicated that the parents' conditions were permanent, chronic and irreversible. Under these circumstances, it is apparent that the two critical circumstances—the parents' limitations and the special needs of the child—that were relevant to the parents' inability to care for their previous children had not changed. In light of these circumstances, we will not consider it an abuse of discretion that the District Court failed to precisely state which "specific circumstances of previous terminations" remained relevant to J.B.'s and C.B.'s ability to care for K.J.B.

19

¶37 The dissent objects to the Court's determination of the dispositive issue. It posits that the "actual dispositive issue" was the insufficiency of the evidence upon which the District Court adjudicated K.J.B. as a youth in need of care. As a result of such insufficient evidence, the dissent asserts, the State did not have lawful custody of K.J.B. after the adjudication hearing in December 2005. It bears repeating, however, that a parent-child relationship may be terminated by the court *without any adjudication*, under certain narrow statutory circumstances, including, inter alia, voluntary relinquishment, abandonment, the conviction of a parent of an offense involving felony sexual intercourse, or the fact that parental rights to other children have already been ". . . involuntarily terminated and the circumstances related to the termination . . . are relevant to the parent's ability to adequately care for the child at issue." *See* §§ 41-3-609(1)(d) and 41-3-423(2)(e), MCA. This circumstance, multiplied by four, was plainly present here. Nonetheless, and though not required to do so under the law, the State continued to work with the parents in an effort to help them gain the skills necessary to adequately care for K.J.B. Only after determining that such skills were not developing did the State conclude the termination on the above statutory grounds. Accordingly, we do not agree that the District Court violated the law.

## CONCLUSION

¶38 For the foregoing reasons, we affirm the District Court's termination of the parental rights of J.B. and C.B. to K.J.B.

/S/ PATRICIA COTTER

20

We Concur:

/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE

Chief Justice Karla M. Gray, dissenting.

¶39    I strenuously dissent from the Court's opinion.  Indeed, I strenuously dissent from the Court's determination that the dispositive issue on appeal is whether the District Court abused its discretion in terminating mother's and father's parental rights to their daughter K.J.B.  In my view, the dispositive issue on appeal is whether sufficient evidence supports the District Court's adjudication of K.J.B. as a youth in need of care.

¶40    The reason for the Court's choice and statement of the dispositive issue in this case becomes apparent only at ¶ 31.  There, the Court comes close to admitting the merit of the parents' position that insufficient evidence supported the District Court's adjudication of K.J.B. as a youth in need of care in December of 2005.  The Court avoids dealing with that issue, however, by "fast forwarding" to a Petition for Termination of Parental Rights and Permanent Custody filed on May 18, 2006, based on § 41-3-609(1)(d), MCA.

¶41    The Court overlooks critical and dispositive facts.  The District Court adjudicated K.J.B. as a youth in need of care in December of 2005, as requested by the State.  On that basis, the

21

court also granted temporary legal custody to the State, and continued that custody thereafter based on the youth in need of care adjudication. Unless the adjudication was based on sufficient evidence, no basis existed for the State's custody of the child from at least December 6, 2005—when the District Court adjudicated K.J.B. a youth in need of care from the bench. The Court apparently is comfortable with the absence of lawful State custody of K.J.B. from December of 2005 until December of 2006, when the District Court terminated mother's and father's parental rights. One can only surmise that the Court implicitly concludes that the procedural facts of this case constitute "fundamentally fair procedures" to protect mother's and father's constitutional liberty interest in parenting their child. *See In re A.J.E.*, 2006 MT 41, ¶ 21, 331 Mont. 198, ¶ 21, 130 P.3d 612, ¶ 21 (citation omitted); *In re T.H.*, 2005 MT 237, ¶ 21, 328 Mont. 428, ¶ 21, 121 P.3d 541, ¶ 21 (citation omitted); *In re V.F.A.*, 2005 MT 76, ¶ 6, 326 Mont. 383, ¶ 6, 109 P.3d 749, ¶ 6 (citation omitted).

¶42   I return briefly to the actual dispositive issue on appeal: Whether sufficient evidence supported the District Court's adjudication of K.J.B. as a youth in need of care in December of 2005. The answer is a resounding no.

¶43   The State removed K.J.B. from the hospital where she was born two days after her birth, pursuant to statutory authority. At the adjudication hearing requested by the State, and held on December 6, 2005, social worker Lee Smith was the only witness for the State. The "substance" of his testimony—if any—was that the removal of the child was "based on the history with this family and our Department and the prior terminations, and the previous findings that the parents were not able to care for their previous children." He indicated that the last evaluations of either parent were several years old. He stated that "based on the past," he felt that the child would be at risk in her parents' custody at that time. On cross-examination, he admitted he had no current

22

indication as to the mental health status of either parent and no indication that mother did not receive proper prenatal care while pregnant with K.J.B. At the State's request, the District Court took judicial notice of the findings of fact, conclusions of law and orders in the four prior termination proceedings involving these parents. The State then requested the adjudication, and opposing counsel argued the State had not met its burden.

¶44 The District Court ruled from the bench, stating that, having taken judicial notice of the other orders, it found "based on *that* sufficient evidence" (emphasis added) that the child was in danger of being abused and neglected and, therefore, was a youth in need of care. The court's subsequent written order found there had been four previous terminations, those terminations were due to mother's and father's inability to parent, the allegations in the State's petition had been proven, and that "sufficient evidence established, by a preponderance of the evidence," that K.J.B. was a youth in need of care pursuant to § 41-3-102, MCA.

¶45 On this record, however, virtually no evidence supported the adjudication of the child as a youth in need of care and her placement in the State's custody. I have no quarrel with the District Court's ability to take judicial notice of the prior proceedings. That is a far cry, however, from permitting a trial court to avoid making findings of fact and conclusions of law adjudicating a child as a youth in need of care based on the present, rather than the past.

¶46 In closing, I note only that we have repeatedly cautioned the State and the district courts to strictly follow the statutes applicable to child abuse and neglect proceedings. *See In re A.R.*, 2004 MT 22, ¶ 23, 319 Mont. 340, ¶ 23, 83 P.3d 1287, ¶ 23; *Inquiry into M.M.*, 274 Mont. 166, 174, 906 P.2d 675, 680 (1995); *Matter of F.H.*, 266 Mont. 36, 40, 878 P.2d 890, 893 (1994); *Matter of R.B.*, 217 Mont. 99, 105, 703 P.2d 846, 849 (1985). We have done so, on occasion, to avoid reversing a trial court's decision. *See, e.g., In re A.R.*, ¶ 23; *Inquiry into M.M.*, 274 Mont.

23

at 173-74, 906 P.2d at 679-80. It is obvious that our cautions continue to fall on deaf ears. Apparently, the State and the trial courts simply do not care what the law is in Montana, as stated by this Court.

¶47 In the present case, the Court places its imprimatur on an entirely unlawful proceeding. I suspect the State and the district courts will finally pay heed—to *this* case. What a tragedy for the rule of law and for parents in Montana.

¶48 I would reverse the District Court. I wholeheartedly dissent from the Court's failure to do so.

/S/ KARLA M. GRAY

Justice James C. Nelson joins in the foregoing dissenting opinion.

/S/ JAMES C. NELSON