DA 07-0588

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 127

IN THE MATTER OF J.C. and A.D.,

        Youths in Need of Care.

APPEAL FROM:    District Court of the Ninth Judicial District,
In and For the County of Teton, Cause No. DN 2005-003
Honorable Thomas M. McKittrick, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Jim Wheelis, Chief Appellate Defender, Roberta R. Zenker, Assistant
Appellate Defender, Helena, Montana

        For Appellee:

            Hon. Mike McGrath, Montana Attorney General, Mark Mattioli, Assistant
Attorney General, Helena, Montana

            Joe Coble, Teton County Attorney, Choteau, Montana

            Sarah Corbally, Assistant Attorney General, Great Falls, Montana

Submitted on Briefs:  February 20, 2008

Decided:  April 21, 2008

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1      On September 13, 2007, the District Court of the Ninth Judicial District, Teton County, terminated the parental rights of G.C. and J.D.  G.C. is the biological mother of J.C., a six year-old boy, and A.D., a five year-old boy.  J.D. is the biological father of A.D. and is currently married to G.C.  J.D. now appeals the District Court's termination of his parental rights to A.D.  We affirm.

## FACTUAL AND PROCEDURAL BACKROUND

¶2      On February 22, 2005, the Teton County Deputy Attorney, on behalf of the Department of Public Health and Human Services (DPHHS), filed a petition for temporary investigative authority (TIA Petition) to conduct an investigation into allegations that J.C. and A.D. had been abused, neglected or abandoned.  A show cause hearing on the TIA Petition was held on March 8, 2005.  After the hearing, the District Court granted the TIA petition by an order dated March 8, 2005.

¶3      The circumstances leading to the filing of the TIA Petition are described in the District Court's order and are undisputed.  On December 9, 2004, DPHHS received a report from a physician in Great Falls, Montana, concerning J.C. and A.D. after they were taken to see him by the parents.  The physician reported that J.C. and A.D. were not clean, were wearing dirty clothes that did not fit, and that J.C. had rotten teeth that appeared to be from bottle rot.  The physician was suspicious that the family "was running from something or somewhere."

¶4      On that same day, J.D. contacted DPHHS community social worker Patty Jacobs stating that he and G.C. had recently moved to Montana from Vermont where they had

2

been receiving services and that they would like to continue to receive those services in Montana. Ms. Jacobs followed up on their prior services in Vermont and contacted Kathy O'Brien, a child protection social worker for the state of Vermont. Ms. O'Brien related she had been assigned to their case, that Vermont had jurisdiction over their case, and that the parents had indicated to officials in Vermont that they were taking a trip to Montana and would be returning to Vermont shortly. Ms. O'Brien then related the following information, as contained in the District Court's order:

> She further advised that the Youths were removed from G.C. on June 9, 2004, because of unsafe and unsanitary living conditions in the home. When Ms. O'Brien investigated and entered the home, both J.C. and A.D. were sharing a playpen surrounded by garbage and rotten food. A.D. had dry feces on his chest that had been smeared around. The workers found feces in the crib in piles and also smeared on the crib rails. Dirty diapers laid around the crib, feces was in toilets left unflushed, food [and] garbage was on the floor throughout the house. Protective Supervision over the parents was granted with the parents required to follow recommendations of the agency. . . . The recommendations put in place were that the parents were to work with Family Based Services, participate in parenting classes and mental health counseling, and that they were to receive medical services.

¶5 When G.C. and J.D. learned that DPHHS would continue with the plan initiated in Vermont, they advised that they would return to Vermont and live in a motel until they could obtain housing. Prior to their arrival in Montana, G.C. had been waiting for housing in Vermont for approximately six months and had been evicted on a previous occasion. While Ms. Jacobs offered to work with G.C. and J.D., she also informed them that if they were to leave Montana, the children would be removed because they would be homeless and without medical, dental, or mental health services. G.C. and J.D. subsequently obtained housing in Choteau, Montana with their children.

¶6     Prior to the show cause hearing on the TIA Petition, a guardian at litem was appointed for the children, and G.C. and J.D. voluntarily entered into a treatment plan with DPHHS.  The first section of this treatment plan, which both parents signed, reads as follows:

**IDENTIFICATION OF THE PROBLEMS OR CONDITIONS THAT RESULTED IN THE ABUSE OR NEGLECT:**

1) J.C. and A.D. have developmental delay issues, including difficulty with language.
2) J.C. has severe dental decay that requires immediate attention.
3) G.C. and J.D. have no knowledge of child development, no knowledge of appropriate parenting skills, and limited home maintenance skills.

¶7     The treatment plan contained four major goals and nine specific tasks for G.C. and J.D. to complete in order to remedy the conditions which resulted in the abuse and neglect of their children.  At the show cause hearing on March 8, 2005, the District Court asked the parents if they objected to the State's involvement in the matter, or to any element of the treatment plan.  Neither of the parents objected to the treatment plan itself, although J.D. did object to one portion of the treatment plan that required him to undergo sex offender counseling.  Although the parents did not have counsel at that time, the District Court informed them that he would appoint counsel in the matter if they requested it.  The parents did not request counsel at that time.

¶8     In an affidavit in support of the TIA Petition, Ms. Jacobs stated that as a result of her thorough investigation into this matter, she concluded that the parents had failed to make progress on the deficiencies which originally led to the intervention by the State of Vermont.  According to Ms. Jacobs, J.C. and A.D. were still in need of medical care, WIC supplements, and evaluation and services for language and speech development.

J.C. was behind in his development, requiring speech evaluation immediately. Ms. Jacobs was concerned about the condition of the children's teeth, their lack of language development, possible hearing deficits, and undergrowth and weight gain. Moreover, J.C. appeared unhappy, was screaming and crying frequently, and A.D. was frequently expressionless and intimidated.

¶9 The District Court granted the TIA Petition. The District Court noted that DPHHS had made reasonable efforts to avoid protective placement of the children and had not removed the children from G.C. and J.D.'s care, as the continuation of the children in the home at that time was not contrary to the welfare of the children. The District Court ordered that DPHHS be granted the necessary authority to access all information concerning the family "which are relevant to the investigation and determination of whether the above-named children are youths in need of care . . . ." As is clear from this language as contained in the order, at the time TIA Petition was granted there had not yet been a formal adjudication that J.C. and A.D. were youths in need of care, notwithstanding the fact that the order granting the TIA Petition was captioned "Order Adjudicating Children as Youth in Need of Care and Granting Temporary Investigative Authority."

¶10 On April 1, 2005, the District Court appointed counsel for J.D. and G.C. On April 5, the children were removed from G.C. and J.D.'s care. On April 7, 2005, less than one month after the granting of the TIA Petition, Teton County, on behalf of DPHHS, filed a Petition for Adjudication of Child as Youth in Need of Care, Immediate Protection and

5

Emergency Protective Services, and Temporary Legal Custody (TLC Petition). In the

TLC Petition, the Teton County Deputy Attorney alleged as follows:

> Since the date of the Show Cause hearing on March 8, 2005, the children's living environment, physical condition and care has deteriorated. This change in their circumstances has necessitated their removal from the home. Specifically, Dr. Laura Shelton has diagnosed J.C. as a Failure to Thrive child. Additionally, Public Health Nurse Jolynn Miller indicates both children are below the 5th percentile in the weight and growth charts and that J.C. has actually lost weight over the past month. As is more specifically set forth in the Affidavit of Social Worker Patty Jacobs attached hereto, the home of the children is not adequately furnished despite the apparent financial ability of the parents to adequately provide furnishings, the children are frequently in dirty, mismatched clothing, and locked in their bedroom or otherwise confined with limited movement in their home. Additionally, A.D. continues to show very little expression or emotional response. On March 28, 2005, a day care provider observed unusual marks on A.D. that were also sticky. It appears duct tape was placed on the child over the front part of his torso and leg area. This matter has been referred to the Teton County Sheriff's Office for investigation. Finally, the dietary needs of the children are still not being met. Day care personnel indicate that every Monday J.C. has diarrhea, but by the end of the week he is fine. Day care personnel have noted that J.C. eats very well at day care and that none of the eating issues are present that the parents complain about. The dental condition of J.C. continues to be a concern. His front teeth are rotten and J.C. complains his teeth hurt him.
> Upon removal of the children by the Social Worker on April 5, 2005, it was discovered that both children were infected with head lice. They have had their heads shaved because larvae and eggs were observed.

¶11 In the TLC Petition, the Teton County Deputy Attorney went on to allege

that:

> [T]here is sufficient evidence to establish, by a preponderance of the evidence, that the above-named child is a Youth in Need of Care as defined in Mont. Code Ann. § 41-3-102 (2003), such that the Court should enter an order of adjudication and temporary legal custody.

¶12 The Teton County Deputy Attorney also requested, in part, the following relief:

6

Following an adjudicatory hearing, Petitioner requests the court to:

2. Incorporate the terms and provisions of its previous orders granting relief;
3. Enter an order adjudicating the children as youths in need of care, by a preponderance of the evidence;
4. Transfer legal custody of the children to the Department of Public Health and Human Services for a period not to exceed 6 months, or until further order of the Court;
5. For any and all other such disposition that protects the welfare of the child.

¶13    On April 8, 2005, the District Court temporarily granted DPHHS temporary legal custody (TLC) over J.C. and A.D., finding that there was probable cause to believe that the children were abused or neglected, and setting a show cause hearing for April 19.  On April 19, the District Court appointed Ms. Meghan Lulf Sutton as counsel for the parents, and continued the show cause hearing to May 6, 2005, allowing the temporary order granting the TLC Petition to remain in place.

¶14    At the May 6 hearing, J.D. and G.C. were represented by Ms. Sutton, and Teton County was represented by Deputy Attorney Ms. Laurie McKinnon.  The transcript of that hearing reads as follows:

COURT:  Alright, this is the time set for a Review Hearing in this matter, the Court having previously granted the State Temporary Investigative authority.  Go ahead.

MS. McKINNON: Well, I'm not sure when the Review Hearing was set, but today's the Show Cause Hearing on an Emergency Removal, as well as on Temporary Legal Custody.

COURT: Alright, you may proceed.  Ms. Sutton?

MS. SUTTON: Yes, Your Honor.  **My clients are going to stipulate to the request for Temporary Legal Custody.**  I have had a conversation with them about that, and they're currently working on a treatment plan

7

and visits have just started.  They have done—after talking to the Social Worker, she tells me the case is progressing and reunification is coming on as planned and hoped for, **and we would stipulate to Temporary Legal Custody.**  I would ask the Court to set a status hearing in three months just to see where we're at with reunification and getting those children back in the home.

COURT:  Alright, **I'll grant, based upon the stipulation of the parents**, I'll grant the State's request for Temporary Legal Custody.  It will last for a period of six months, and it will expire on November 4th.  We'll have a hearing on July 26th, a Review Hearing, to determine the status of this matter, and at that time, if necessary, I'll set a further Review Hearing prior to the expiration of Temporary Legal Custody.  Will that work?

MS. McKINNON:  Yes, Judge, thank you.

COURT:  If you want to give me an order to that effect, I'll sign it, okay.

MS. SUTTON:  Thank you, Your Honor.

(Emphasis added).

¶15   The District Court signed an order granting the TLC Petition that same day. Based upon the evidence and allegations contained in the TLC Petition, the District Court issued the following findings of fact in support of its decision:

2. A Petition for Adjudication of Children as Youth in Need of Care and Temporary Investigative Authority was previously filed and granted on March 8, 2005.
3. Since that date, the living environment, physical condition and care of the children has deteriorated.
4. Dr. Laura Shelton diagnosed J.C. as a Failure to Thrive child.
5. Public Health Nurse JoLynn Miller indicates both children are below the 5th percentile in weight and growth charts, specifically J.C. had lost weight.
6. A.D. has been observed to show little expression or emotional response.
7. Daycare provider observed unusual marks on A.D.  It appeared that duct tape had been placed on the child over the front of his torso and leg area.
8. The Youths dietary needs have not been meet.

8

9. J.C. continues to have dental concerns, i.e., his front teeth have rotted.

10. The Court appointed Meghan Lulf Sutton to represent G.C., Mother of the Youths, and J.D., Father/Stepfather of the Youths.

¶16 These findings, in turn, led the District Court to issue the following conclusions of law:

2. The Court has jurisdiction of this matter.

3. The Petitioner has shown by a preponderance of the evidence that continued court and department intervention is required.

4. The above-named children were adjudicated as Youth in Need of Care on March 8, 2005.

5. Temporary Legal Custody is appropriate and in the best interest of the children.

¶17 On October 18, 2005, Teton County filed a Petition for Extension of Temporary Legal Custody (TLC Extension Petition). The deputy attorney alleged in this Petition that the children continued to suffer abuse and neglect. In the TLC Extension Petition, the deputy attorney also alleged that since entering into a treatment plan and agreeing to work with DPHHS, J.D. and G.C. had received two eviction notices. Although arrangements had been made for them to undergo evaluation for gambling problems, the parents denied they had gambling problems in spite of the fact that they both frequented casinos. Moreover, the parents were asked to see a therapist for couples counseling since they had troubling getting along and were fighting continuously. They told Ms. Jacobs that they had done so but, in fact, they had not attended any counseling at all. Further, they refused to sign releases allowing DPHHS to gather the required information in accordance with their treatment plan. They also refused to schedule appointments with DPHHS social workers to work on nutritional issues, as required under their treatment

9

plan. Accordingly, the deputy attorney re-alleged that there was sufficient evidence to establish by a preponderance of the evidence that they were youths in need of care (YINC), as defined in § 41-3-102, MCA, and that the original TLC Petition should be extended.

¶18 At a show cause hearing on the TLC Extension Petition on October 25, 2005, J.D. and G.C. were once again represented by counsel. During this hearing, the following exchange occurred:

> COURT: Alright, this is a hearing on the Order to Show Cause. It appears that the State is asking for a continuation of Temporary Legal Custody; is that correct?
>
> MS. McKINNON: Yes, Judge.
>
> COURT: Is there any objection from the parents as to a continuation of that Temporary Legal Custody?
>
> MS. SUTTON: Your Honor, I had a lengthy discussion with Patty Jacobs and Ms. McKinnon, and we hammered out a new treatment plan, **and my clients have agreed to stipulate to that, I'm stipulating on behalf of my clients, at this time, to the extension of T. L. C.**

(Emphasis added).

¶19 The first section of this second treatment plan, to which the parents stipulated in open court and later signed, states as follows:

> **IDENTIFICATION OF THE PROBLEMS OR CONDITIONS THAT CONTINUE TO CONTRIBUTE TO THE CONDITIONS OF ABUSE AND/OR NEGLECT:**
>
> 2. Failure to pay bills that are necessary to maintain warm, safe housing.
> 3. Failure to work with Quality Life Concepts; missed appointments.
> 4. Failure to work cooperatively with Family Based Services; rudeness to the provider.

5. Failure to attend counseling; told Social Worker they were attending.
6. Failure to attend nutritional education; refusal to set appointments resulting in nurses being unable to spend the time to work with G.C. and J.D. if they did happen to show up at [the] Public Health Department.

¶20 A review hearing was later set for January 10, 2006. At that time, G.C. and J.D. were again represented by Ms. Sutton, at which the following colloquy occurred:

COURT: Now . . . since this is a review hearing, do we need to do anything more?

MS. McKINNON: Nothing more from the State, Your Honor.

MS. SUTTON: Your Honor, **we're stipulating to the treatment plan and we don't have any opposition to that, at this time.**

COURT: There is a treatment plan in place that has been signed off on by the Court, I believe?

MS. SUTTON: Yes, Your Honor.

(Emphasis added.)

¶21 Another review hearing was held on March 14, 2006, where the District Court received an update on the parents' progress. Prior to the date of this hearing, separate counsel was appointed for J.D. because DPHHS had expressed to the parents that it might seek to terminate their parental rights. At the hearing, Ms. Jacobs testified that the home visits were not able to be properly supervised because of the smell of cigarette smoke in the apartment, and that the excessive smoke was causing wheezing with the children. Moreover, Ms. Jacobs stated that based on the observations of care providers "the least amount of contact they have with their parents, that the less aggressive they are and the better their behaviors are, which leads to the concerns of their treatment of the children

and their compliance with the treatment plan, or I should say their failure with the treatment plan." The District Court expressed concern over the smoking issue and set another review hearing for April 25, 2006.

¶22 Prior to the next review hearing, G.C. and J.D. signed and agreed to a third treatment plan. The first section of this third treatment plan read as follows:

**IDENTIFICATION OF THE PROBLEMS OR CONDITIONS THAT RESULTED IN THE ABUSE OR NEGLECT.**

1) J.C. and A.D. have developmental delay issues, especially in the area of language skills.
2) G.C. and J.D. have limited parenting skills and limited home maintenance skills. G.C. and J.D. have limited knowledge of child development.
3) G.C. and J.D. have anger management problems. This causes them to ignore the service providers who are trying to teach them new skills.
4) G. C. and J.D. have relationship problems, creating a tremendous amount of tension and stress in the home environment.
5) G.C. and J.D. have been unable to manage payment of monthly living expenses, both have gambling issues that need to be addressed.
6) G.C. and J.D. have childhood abuse issues that interfere with appropriate parenting. In addition, because of their abusive childhoods, extended family is not a supportive option for these young parents.

¶23 At the April 25 hearing, the parties again stipulated to continuing the TLC Petition. At that hearing, S.M. (the biological father of J.C.), was represented by William E. Hunt, Jr. Mr. Hunt argued that, under statute, the District Court was required to hold a permanency hearing under § 41-3-445, MCA, given the length of TLC. The District Court stated its belief that there was no limitation on the timeframes of TLC, so long as the District Court granted them in six month intervals. However, to address concerns raised by counsel and ensure compliance with statutory procedures, the District Court deemed the proceeding a permanency hearing based on testimony given by Ms. Jacobs

12

concerning the children's status and the parents' progress on their treatment plans. After her testimony, Ms. Sutton addressed the District Court:

> MS. SUTTON: 41-3-445 provides that a permanency hearing can be held in conjunction with any other hearing, and it sets forth some criteria of what needs to be discussed at the permanency hearing, and to satisfy Mr. Hunt's objection, they could call this a review hearing on a permanency plan. We're satisfied that all the criteria under the statute, from Ms. Jacobs' testimony today, has been satisfied . . . .

¶24 On June 30, 2006, S.M. filed a petition through his attorney Mr. Hunt to have J.C., his biological son, temporarily reside with him in Vermont. On July 25, 2006, the District Court granted the petition, allowing J.C. to temporarily reside with S.M. in Vermont from July 31 to September 1. This date was later extended.

¶25 On October 11, 2006, the Teton County Deputy Attorney, on behalf of DPHHS, filed a petition to terminate G.C. and J.D.'s parental rights. A hearing was eventually held on this petition on December 12, 2006. However, the District Court did not grant the petition at that time. Although the District Court received evidence that the parents had not complied with previous treatment plans, the District Court was concerned that the existence of multiple treatment plans created some doubt as to which plan had not properly been complied with, and that this uncertainty could leave the proceedings open to reversal on appeal. As a result, the District Court ordered the parents to enter into a fourth treatment plan so that they would have another chance to comply with its terms, leaving no doubt about the propriety of a potential termination.

¶26 On October 24, 2006, DPHHS stipulated to extend S.M.'s custody of J.C. until January 31, 2007. This stipulation, to which neither G.C. nor J.D. objected, states in part

that "J.C. was adjudicated as a Youth in Need of Care on March 8, 2005." On February 22, 2007, in response to a motion from DPHHS, the District Court allowed S.M. to retain custody of J.C. in Vermont. According to the record, J.C. continues to reside with S.M. in Vermont.

¶27 With respect to A.D., however, DPHHS continued to retain TLC. On January 24, 2007, the parents entered into a fourth treatment plan with DPHHS. The first section of this fourth treatment plan, which the parents signed and stipulated to, reads as follows:

> **IDENTIFICATION OF THE PROBLEMS OR CONDITIONS THAT RESULTED IN THE ABUSE OR NEGLECT.**
>
> 1) G.C. and J.D. have limited parenting skills and limited home management skills. G.C. and J.D. have limited knowledge of child development.
>
> 2) G.C. and J.D. have limited knowledge of nutritional education, causing their children to be diagnosed with Failure to Thrive. In addition, G.C. and J.D. do not attend to their own nutritional needs.
>
> 3) G.C. and J.D. must stop smoking, as both of their children are diagnosed with asthma. Doctors recommend these children be kept from cigarette smoke.

¶28 On March 23, 2007, another review hearing was held. At that time, the District Court heard testimony concerning the parents' progress toward meeting the treatment goals, which indicated that the parents were not complying with the treatment plan. At the end of the hearing, the District Court addressed the parents, who were still represented by counsel, and informed them that "[t]he State's going to move to terminate so you have to do what they ask of you in a hurry to stop that, to convince the Court."

14

¶29 On June 11, 2007, DPHHS filed a second Petition for Permanent Legal Custody and Termination of Parental Rights with the Right to Consent to Adoption (Termination Petition). In support of the Termination Petition, DPHHS alleged that: (1) A.D. and J.C. had been adjudicated as YINC within the meaning of § 41-3-102, MCA (2005), by the District Court on May 6, 2005; (2) four appropriate treatment plans had been prepared and approved by the District Court and G.C. and J.D. had failed to comply with them; (3) the conduct or condition rendering J.D. and G.C. unfit parents is unlikely to change within a reasonable time; (4) the continuation of the parent-child relationship will likely result in continued abuse or neglect; (5) the children had been in out-of-home care for approximately twenty-four months; and (6) that the best interest of the children would be served by terminating G.C. and J.D.'s parental rights and granting DPHHS's Petition.

¶30 On September 13, 2007, a termination hearing was held before the District Court. Based on the evidence taken at that hearing, and the fact that G.C. and J.D. had failed to comply with the most recent treatment plan, the District Court granted the Termination Petition. In its order, the District Court stated that J.C. and A.D. had been adjudicated YINC on March 8, 2005, and that, based on the evidence before it, all the other statutory requirements for a termination had been satisfied.

¶31 On October 25, 2007, J.D. filed a notice of appeal with this Court challenging the termination of his parental rights. The kernel of J.D.'s appeal is that the District Court abused its discretion in terminating his parental rights because A.D. and J.C. were never formally adjudicated as youths in need of care prior to the termination of J.D. and G.C.'s

parental rights. J.D. argues that the absence of this adjudication requires reversal of the proceedings below. J.D.'s appeal is timely taken.

## ISSUE

¶32 We state the sole issue on appeal as follows: Did the District Court err in terminating J.D.'s parental rights?

## STANDARD OF REVIEW

¶33 We review a district court's decision to terminate parental rights for an abuse of discretion. *In re L.H.*, 2007 MT 70, ¶ 13, 336 Mont. 405, ¶ 13, 154 P.3d 622, ¶ 13. "An abuse of discretion occurs when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason." *State v. McCaslin*, 2004 MT 212, ¶ 15, 322 Mont. 350, ¶ 15, 96 P.3d 722, ¶ 15.

¶34 When making a decision to terminate parental rights, the district court must make specific factual findings in accordance with the requirements of § 41-3-609, MCA, and we review these factual findings under the clearly erroneous standard. *In re L.H.*, ¶ 13. "A finding is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if our review of the record convinces us that a mistake has been committed." *Gelderloos v. Duke*, 2004 MT 94, ¶ 22, 321 Mont. 1, ¶ 22, 88 P.3d 814, ¶ 22 (citations omitted). We review the district court's conclusions of law in terminating parental rights to determine if they are correct. *In re L.H.*, ¶ 13.

## DISCUSSION

¶35 "The termination of parental rights invokes fundamental liberty interests which must be protected by fundamentally fair procedures." *In re Custody and Parental Rights of M.W. and C.S.*, 2001 MT 78, ¶ 4, 305 Mont. 80, ¶ 4, 23 P.3d 206, ¶ 4 (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388 (1982)). "We have previously held that fundamental fairness requires that a parent be represented by counsel at proceedings to terminate parental rights in order to 'have an equal opportunity to present evidence and scrutinize the State's evidence.' " *In re Custody of M.W.*, ¶ 25 (quoting *In re A.S.A., J.L.A., G.A. and A.J.A.*, 258 Mont. 194, 198, 852 P.2d 127, 129 (1993)). We have also stated that "due process requires that the parent not be placed at an unfair disadvantage during the termination proceedings." *In re A.S.*, 2004 MT 62, ¶ 12, 320 Mont. 268, ¶ 12, 87 P.3d 408, ¶ 12 (footnote omitted). Moreover, the party seeking termination must "prove each of the applicable statutory requirements before terminating an individual's parental rights." *In re Custody of M.W.*, ¶ 4. "Additionally, when considering the criteria for termination of parental rights, courts must give primary consideration to the best interests of the child as demonstrated by the child's physical, mental, and emotional needs." *In re F.M. and D.M.*, 2002 MT 180, ¶ 22, 311 Mont. 35, ¶ 22, 53 P.3d 368, ¶ 22. Moreover, Article II, Section 15 of the Montana Constitution, explicitly guarantees to those persons under the age of eighteen "all the fundamental rights of . . . Article [II] unless specifically precluded by laws which enhance the protection of such persons."

¶36 The required statutory criteria for termination are at § 41-3-609, MCA (2005), and read as follows:

**41-3-609. Criteria for termination**

17

(1) The court may order a termination of the parent-child legal relationship upon a finding established by clear and convincing evidence, except as provided in the federal Indian Child Welfare Act, if applicable, that any of the following circumstances exist:

(a) the parents have relinquished the child pursuant to 42-2-402 and 42-2-412;

(b) the child has been abandoned by the parents;

(c) the parent is convicted of a felony in which sexual intercourse occurred or is a minor adjudicated a delinquent youth because of an act that, if committed by an adult, would be a felony in which sexual intercourse occurred and, as a result of the sexual intercourse, the child is born;

(d) the parent has subjected a child to any of the circumstances listed in 41-3-423(2)(a) through (2)(e);

(e) the putative father meets any of the criteria listed in 41-3-423(3)(a) through (3)(c); or

(f) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

¶37 The facts of this case fall under subsection (f) of the statute. J.D. maintains that under subsection (f) a YINC adjudication a jurisdictional prerequisite to a parental termination, argues that no such adjudication occurred in this case, and, further, that the parents never stipulated that A.D. and J.C. were YINC. J.D. notes that the District Court's order granting the Termination Petition states that J.C. and A.D. were adjudicated as YINC on March 8, 2005. J.D. maintains that a review of the March 8 order shows that J.C. and A.D.'s status as YINC was never formally adjudicated at that time, and that they were never in fact adjudicated as YINC during any of the subsequent proceedings over the course of approximately two years. As a result, J.D. maintains, the TIA, TLC, court-

18

approved treatment plans, and termination proceedings are not valid, and the termination of his parental rights by the District Court must be reversed.

¶38 As an initial matter, we note that a YINC adjudication is not always required for TIA and court-approved treatment plans. Under § 41-3-433, MCA (2005), DPHHS "may petition the court for authorization to conduct an investigation into allegations of child abuse, neglect, or abandonment when necessary. An order for temporary investigative authority may not be issued for a period of longer than 90 days. The petition must be served as provided in 41-3-422." The statute makes no mention of an YINC adjudication. This makes sense because TIA is generally granted in order to allow DPHHS to determine if a child is a YINC. Similarly, under § 41-3-443(1), MCA (2005), "[t]he court may order a treatment plan if: (a) the parent or parents admit the allegations of an abuse and neglect petition; (b) the parent or parents stipulate to the allegations of abuse or neglect pursuant to 41-3-434; or (c) the court has made an adjudication under 41-3-437 that the child is a youth in need of care." Here, the parents admitted their children had been abused or neglected on four occasions in the treatment plans they entered into with DPHHS. *See* ¶¶ 7, 20, 23, 28. Thus, the treatment plans and TIA were proper, irrespective of an YINC adjudication.

¶39 However, J.D. correctly notes that an adjudication that a child is a YINC is required for TLC under § 41-3-442(1), MCA (2005), and for a termination of parental rights under § 41-3-609(f), MCA (2005), if none of the other criteria under § 41-3-609, MCA (2005), are applicable. *See* ¶ 37. "By definition, a 'youth in need of care' . . . is a youth who has been adjudicated or determined, after a hearing, to be or to have been

19

abused or neglected. Such a finding, pursuant to § 41-3-404(1), MCA, must be determined by a preponderance of the evidence." *In re B.N.Y.*, 2003 MT 241, ¶ 26, 317 Mont. 291, ¶ 26, 77 P.3d 189, ¶ 26. Moreover, we have repeatedly referred to the YINC adjudication as a jurisdictional prerequisite, or "threshold requirement," to the termination of parental rights. *In re B.N.Y.*, ¶ 22; *In re M.O., M.O. and M.O.*, 2003 MT 4, ¶ 12, 314 Mont. 13, ¶ 12, 62 P.3d 265, ¶ 12.

¶40 Throughout these proceedings, the District Court continuously stated that J.C. and A.D. had been adjudicated as YINC on March 8, 2005. As noted above at ¶ 10, despite the fact that the order was captioned "Order Adjudicating Children as Youth in Need of Care and Granting Temporary Investigative Authority," no adjudication occurred on that date. Instead, the District Court granted DPHHS TIA so that it could have all the necessary powers to conduct an investigation to determine whether J.C. and A.D. were YINC.

¶41 However, an adjudication of the children's YINC status was not actually required until the District Court granted TLC on May 6. The State acknowledges that it did not present evidence that the children were YINC at the adjudication hearing on May 6, but argues that this failure amounts to harmless error in this case and did not undermine the fundamental fairness of these proceedings. The State, citing to *In re F.H., J.K., and B.K.*, 266 Mont. 36, 878 P.2d 890 (1994) and *In re A.N. and C.N.*, 2000 MT 35, 298 Mont. 237, 995 P.2d 427, notes that we have previously applied the doctrine of harmless error in the parental termination context.

¶42    The State asserts that DPHHS did not present evidence of abuse and neglect in support of a formal adjudication at the May 6 hearing because the parents stipulated to treatment plans—in which they admitted their children had been abused or neglected—and also stipulated in open court to the TLC Petition. *See* ¶ 14. The State concedes that its counsel and the District Court should have sought a specific stipulation from the parents, or taken evidence and made an adjudication based on evidence presented at that time, but that because the parents were stipulating to the proceedings through counsel, and did not object to the contents of the treatment plans, TLC Petition, or subsequent petitions thereafter, the State's failure to present evidence and "any error below did not undermine the fundamental fairness of the proceedings and would be harmless."

¶43    We conclude that the error in these proceedings was harmless and did not offend the parents' due process rights. As we have previously stated, "[t]his Court has consistently interpreted abuse and neglect statutes to protect the best interest of the children. 'In matters involving abused and neglected children we have consistently held that a district court may protect the children's best interest despite procedural error.' " *In re Inquiry Into M.M., A.D., and L.D.*, 274 Mont. 166, 173, 906 P.2d 675, 679 (1995) (quoting *In re F.H.*, 266 Mont. at 39, 878 P.2d at 892). In *In re F.H.,* we cited to numerous Montana cases in which procedural errors were held harmless and did not prevent us from protecting the best interest of children. *In re F.H.*, 266 Mont. at 39, 878 P.2d at 892. In *In re A.N.,* we upheld a termination even though it was based on compliance with an unconstitutional treatment plan which forced a father "to choose between his Fifth Amendment right against self-incrimination and his parental rights." *In*

21

*re A.N.*, ¶ 38. We affirmed the termination, stating that "[o]n this record, we cannot conclude that inclusion of the inappropriate requirements in [the father's] . . . treatment plan significantly impacted on the District Court's decision or resulted in substantial injustice." *In re A.N.*, ¶ 41. In so doing, we relied upon the "well established [principle] . . . that 'no civil case shall be reversed by reason of error which would have no significant impact upon the result; if there is no showing of substantial injustice, the error is harmless.' " *In re A.N.*, ¶ 39 (quoting *Newbauer v. Hinebauch*, 1999 MT 115, ¶ 20, 288 Mont. 482, ¶ 20, 958 P.2d 705, ¶ 20).

¶44 Many other jurisdictions similarly apply the harmless error doctrine in termination proceedings. As the South Dakota Supreme Court has stated, "[o]n rare occasions, this Court has applied harmless error analysis to the adjudicatory phase to affirm the termination of parental rights despite errors occurring below. The question is 'if reversing for an adjudicatory hearing will truly produce any rational possibility of a different result.' " *Interest of J.G.R.*, 691 N.W.2d 586, 592 (S.D. 2004) (quoting *Interest of C.V.*, 579 N.W.2d 17, 20 (S.D. 1998)). Similarly, the North Dakota Supreme Court has held that "non prejudicial mistakes" in termination proceedings constitute harmless error and are not grounds for reversal. *In the Interest of K.S. and A.S.*, 652 N.W.2d 341, 346 (N.D. 2002).

¶45 By the time of the May 6 hearing, the parents agreed to a treatment plan in which they admitted their children were abused or neglected. At the May 6 hearing, the parents then stipulated in open court to the TLC Petition. They were represented by counsel who did not object to any part of the TLC Petition which clearly states that "Petitioner alleges

22

that there is sufficient evidence to establish, by a preponderance of the evidence, that the above-named child is a Youth in Need of Care . . . such that the Court should enter an order of adjudication and temporary legal custody."  Additionally, the TLC Petition contains specific allegations of abuse and neglect, including an affidavit from DPHHS social worker Patty Jacobs.  (*See* ¶¶ 10-11.)  The District Court made clear that it was granting the TLC Petition based on the stipulation of the parents in open court.  In previous situations, we have recognized that parents may stipulate a child is a YINC and that such a stipulation will satisfy this threshold requirement of an YINC adjudication in the absence of a formal adjudication hearing.  *In re M.B., J.B., W.B.*, 2004 Mont. 304, ¶ 17, 323 Mont. 468, ¶ 17, 100 P.3d 1006, ¶ 17.  In its order granting the TLC Petition, the District Court found that:

2. The Petitioner has shown by a preponderance of the evidence that continued court and department intervention is required.
3. The above-named children were adjudicated as Youth in Need of Care on March 8, 2005.

¶46    The error committed by the District Court in this and subsequent orders was its repeated reference to March 8 as the date of adjudication, whereas in reality May 6 was the date upon which the District Court established, by a preponderance of the evidence and the stipulation of the parties, that continued involvement was required.  As J.D. correctly notes, the "YINC definition calls for a definite determination of abuse, neglect, or abandonment."  The evidence from the treatment plans, TLC Petition, and the District Court's findings of fact and conclusions of law (*See* ¶¶ 10-16), demonstrate that abuse and neglect of these children was determined and established by a preponderance of the

23

evidence by the May 6 hearing. While J.D. avows that neither he nor G.C. ever stipulated that J.C. and A.D. were YINC, he fails to consider the significance of stipulating to the TLC Petition and TLC Extension Petition in open court though counsel. (*See* ¶¶ 14, 18.) While J.D.'s appellate counsel has carefully examined the record and correctly noted that no adjudication actually occurred on March 8, and that the District Court's repeated references to that date as the date of adjudication was in error, she has failed to establish why this erroneous reference is anything other than procedural in nature, given the parents' repeated stipulations to the TLC Petition which alleged that a preponderance of the evidence established that J.C. and A.D. were YINC and contained sufficient evidence to support those allegations, as well as the District Court's findings of fact in the order granting the TLC Petition. (*See* ¶ 15.)

¶47 J.D. does not challenge the evidence or allegations contained in either petition, nor does he allege that he or his counsel was not aware of their contents, that he was misled as to the nature of the proceedings, or that the proceedings were fundamentally unfair. In this regard, the cases upon which J.D. relies, *In re B.N.Y.* and *In re M.O.*, are distinguishable. In *In re B.N.Y.*, for instance, we reversed a termination of parental rights because were there was no evidence of abuse and neglect, or findings to that effect which were established by a preponderance of the evidence. *In re B.N.Y.*, ¶ 12. In that case, the mother whose rights were terminated never properly stipulated that her children were abused or neglected in a treatment plan, and no adjudication had occurred; thus, we held the treatment plan and subsequent termination was invalid. *In re B.N.Y.*, ¶ 26. Here, by contrast, the parents have stipulated to and signed treatment plans which alleged that their

24

children have been abused or neglected. They have had counsel throughout these proceedings. They also stipulated to the TLC Petition, which explicitly stated that the evidence established, by a preponderance, that continued court involvement was required and that the children were youths in need of care, even though the date of adjudication which it referred to was erroneous. J.D. and G.C. then stipulated to the TLC Extension Petition, which alleges the same. Finally, J.D. and G.C. did not object, at either termination hearing, that the children were not adjudicated YINC.

¶48 In *In re M.O.*, a petition seeking TIA was filed by DPHHS with respect to a mother's (L.K.) three children. At the time, L.K., who was not represented by counsel, objected to some of the factual allegations in the petition and reserved her right to object to those allegations at a later date. *In re M.O.*, ¶ 3. Five days prior to a review hearing on the TIA, DPHHS filed a petition for TLC, and a show cause hearing for TIA and TLC was scheduled for April 3, 2000. At the joint hearing, DPHHS informed the district court that it had not actually filed a petition for TLC, but that it would do so if L.K. had no objection. L.K., who was still not represented by counsel at that time, agreed to the TLC petition, although at that time there was no evidence or testimony taken concerning the TLC petition. The district court subsequently granted the petition.

¶49 The TLC petition was extended on two occasions. Then, on April 23, 2001, DPHHS filed a petition to terminate L.K.'s parental rights. The district court granted the petition, and in its order stated that L.K.'s children had been adjudicated as YINC on April 3, 2000. *In re M.O.*, ¶ 8. L.K. appealed the termination, and we reversed. In that case, there was no testimony and no evidence taken at the April 3, 2000 proceedings.

25

Thus we concluded that "the court neither made nor could have made—given the absence of any evidence—a determination that a preponderance of the evidence established the children were youths in need of care." *In re M.O.*, ¶ 15.

¶50     In the instant case, the evidence of abuse and neglect as set forth in the TLC Petition, order granting the TLC Petition, and TLC Extension Petition, is overwhelming. If the parents had objected to any part of the TLC Petition or subsequent findings of the District Court, or disputed the status of their children as YINC, the District Court could have easily made a ruling on the children's YINC status at that time.  As it stands, the District Court's May 6 order clearly indicates that it was granting TLC based on the parents' stipulation and a preponderance of the evidence that TLC should be granted. The factual findings issued by the District Court in support of its decision demonstrate abuse and neglect by a preponderance of the evidence (*See* ¶ 16), showing that J.C. and A.D. were YINC. *In re B.N.Y.*, ¶ 26 ("[A] 'youth in need of care' . . . is a youth who has been adjudicated or determined, after a hearing, to be or to have been abused or neglected . . . by a preponderance of the evidence.").  We agree that the District Court should have made the adjudication effective on May 6 instead of referring to the March 8 adjudication.  To its credit, DPHHS alone noticed that May 6 was properly the date of adjudication, and in both of its termination petitions alleged that A.D. and J.C. had been adjudicated as YINC by the District Court on May 6, 2005, not on the erroneous March 8 date.  However, the error committed by the District Court in this case is harmless and did not undermine the fundamental fairness of the termination proceedings.

¶51 While we agree with J.D. that parents should not have their parental rights terminated based solely on "unwitting stipulations" due to erroneously captioned court documents, such is not the case here. A review of the record demonstrates unequivocally that these parents were afforded full due process at every stage, and had ample opportunity to object to the proceedings and findings, yet they stipulated and agreed to the court proceedings through counsel and at every turn.

¶52 A reversal at this point in the proceedings on the grounds advocated by J.D. would have a devastating effect on the rights of the children and their best interests. The evidence of abuse and neglect in this case is overwhelming, and the parents have been afforded ample opportunity to comply with treatment plans, object to any evidence presented against them on the issues of neglect or abuse, and ensure that their rights have been respected and protected. More importantly, if the parents had timely objected that J.C.'s and A.D's YINC status had not been adjudicated, the District Court could have done so easily due to the ample evidence before it.

¶53 In her dissent, Chief Justice Gray expresses concern that our Opinion in this case will subject "any and every statutory requirement" relating to the termination of parental rights to the "harmless error axe" (Gray, C.J., Dissent at ¶ 57), and that the Court "simply writes both the statutory and jurisprudential bases for the [YINC] adjudication out of existence . . . ." (Gray, C.J., Dissent at ¶ 62.) Similarly, in his dissent Justice Nelson expresses concern that our approach in this case will "encourage sloppy practice and procedures in the termination process" and thereby deny parents the benefits of their constitutional rights. (Nelson, J., Dissent at ¶ 73.) These concerns are well-founded.

27

The doctrine of harmless error should be applied in parental termination cases only on the rarest of occasions and with great caution. In the overwhelming majority of cases, failure to strictly comply with the statutory requirements governing termination proceedings will constitute grounds for reversal.

¶54 However, the record before us shows that this is one of those very rare occasions where the harmless error doctrine should be applied. The Chief Justice argues that the parents' repeated agreement to treatment plans and their subsequent stipulations to the proceedings should not be construed to mean that the children in this case were adjudicated as youths in need of care. (Gray, C.J., Dissent at ¶¶ 66, 67.) However, Chief Justice Gray fails to make mention of the District Court's findings in this case pursuant to the May 6 hearing, which establish abuse and neglect of the children by a preponderance of the evidence. (*See* ¶ 15.) The allegations and evidence in support of these findings were contained in the TLC Petition and the affidavit of Ms. Jacobs which was attached thereto. By stipulating to the TLC Petition, and by failing to object to any of its contents or the evidence contained therein, the parents admitted those allegations as true and, more importantly, the evidentiary bases upon which the District Court made its decision. Thus, this case is a far cry from situations such as *In re M.O.* and *In re B.N.Y.*, where there was no evidence of abuse or neglect before the district courts. Had the District Court failed to make these findings, or if there was even the remotest suggestion that they were not supported by substantial evidence, the case for reversal would be much more compelling. However, the point of an adjudicative hearing on a child's status as a YINC is to establish, by a preponderance of the evidence, that the child has been abused or

28

neglected. The District Court did that here by virtue of the May 6, 2005 hearing when it decided to grant the TLC Petition.

¶55 On appeal, the parents do not point to any substantive manner in which the proceedings in this case violated their due process rights. Although J.D. correctly notes a procedural error in the District Court's proceedings, he does not argue this error affected the outcome of the case or that the error prejudiced him in substantive manner. When parents, who are represented by counsel, stipulate time and again to treatment plans and TLC petitions which allege their children have been abused or neglected and are adjudicated YINC, and fail to lodge any objections whatsoever, we should not turn a blind eye to the best interests of the children, and their constitutional rights—especially given that Article II, Section 15 of the Montana Constitution explicitly guarantees to those persons under eighteen "all the fundamental rights of . . . Article [II] unless specifically precluded by laws which enhance the protection of such persons."

## CONCLUSION

¶56 In face of the overwhelming evidence and repeated stipulations of the parents to allegations of abuse and neglect, the District Court did not abuse its discretion in terminating G.C. and J.D.'s parental rights. Although the District Court erred in concluding a YINC adjudication of the children occurred on March 8, 2005, subsequent proceedings rendered this error harmless. Thus, we affirm the termination of G.C. and J.D.'s parental rights.

/S/ PATRICIA COTTER

29

We concur:

/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ JOHN WARNER
/S/ BRIAN MORRIS

Chief Justice Karla M. Gray, dissenting.

¶57     I respectfully, but strenuously, dissent from the Court's opinion.  I totally agree that the best interests of the children are ultimately the paramount consideration in child abuse and neglect cases.  It is my view, however, that statutory and jurisprudential rules must be followed in reaching that ultimate stage.  Today, the Court determines that a failure to adjudicate children as youths in need of care—an adjudication clearly required by statute as a prerequisite to termination of parental rights and by this Court's jurisprudence holding such an adjudication is a required threshold step in the process—can constitute harmless error which does not violate a parent's fundamental liberty interests in fundamentally fair procedures.  I conclude from this that not a single statutory requirement need be followed during trial court proceedings involving allegations of child abuse or neglect—that is, any and every statutory requirement can fall to the "harmless error" axe.  I cannot agree that the end justifies the means when fundamentally fair procedures are constitutionally required.

¶58     I also cannot agree that repeated "findings" by the trial court—that an adjudication which did not occur actually occurred in early March of 2005—can possibly be other

30

than clearly erroneous findings. Under nearly identical circumstances, we have held such a finding "plainly wrong" without equivocation. *Matter of T.C.*, 2001 MT 264, ¶ 16, 307 Mont. 244, ¶ 16, 37 P.3d 70, ¶ 16. We should do so here and, on that basis, reverse.

¶59 My remaining disagreements with the Court's opinion are numerous and substantial, but I will address just the most serious of them in order to avoid further delay. I begin with the errors—of omission and commission—which are contained in the FACTUAL AND PROCEDURAL BACKGROUND portion, and which set the stage for a flawed legal analysis.

¶60 First, the record is clear that the petition filed on February 22, 2005, was not merely a TIA Petition, as the Court terms it. It was a "Petition for *Adjudication of Child as Youth in Need of Care* and Temporary Investigative Authority" (emphasis added) which contained *allegations* that "sufficient evidence . . . establish[es] the . . . children are Youths in Need of Care and requested the trial court to enter "an order of adjudication and temporary investigative authority." During the March show cause hearing on the petition, the only mention that an adjudication of the children as youths in need of care was being sought came from the District Court at the very outset of the hearing. Nothing more was said and no evidence or testimony was presented. Notwithstanding the form order presented to the trial court suggesting that it was an adjudication order as well as an order granting TIA, the record is clear that no adjudication occurred. Subsequent petitions likewise were dual in nature; for example, the petition for TLC was also a petition for adjudication. The record remains clear that no adjudication ever occurred in this case.

31

¶61    I also observe with some dismay the Court's repeated reliance on the parents stipulating to TIA, and later TLC, as though those stipulations bear any relationship to the required adjudication of the children as youths in need of care. A parent's stipulation to TLC—and presumably TIA—is not a stipulation that the children are youths in need of care; nor does a trial court's adoption of such a stipulation imply that the court adjudicated the children as such. *See e.g. Matter of T.C.*, ¶¶ 17-18.

¶62    The Court does correctly set forth § 41-3-609(1)(f), MCA, as containing the criteria on which the termination of parental rights in the present case was intended to proceed. *See* ¶¶ 36-37. The first statutory criterion, of course, is that the child is an adjudicated youth in need of care. If the adjudication is not made at the initial show cause hearing, it must be made within 90 days thereafter. Sections 41-3-432 and 41-3-437, MCA. The Court candidly cites, at ¶ 39, to the cases in which this Court has "repeatedly referred to the YINC adjudication as a jurisdictional prerequisite, or 'threshold requirement,' to the termination of parental rights." The Court then simply writes both the statutory and the jurisprudential bases for the adjudication out of existence by moving on to a "harmless error" analysis and improperly "distinguishing" the noted cases. I cannot agree.

¶63    It is true that we have, on occasion, applied the harmless error standard in a termination of parental rights case. We have never done so, however, in a case where no adjudication of children as youths in need of care—the initial requirement pursuant to both statute and our cases—occurred, and the Court does not suggest otherwise. How a proceeding which culminates in a termination of parental rights, but which begins by

ignoring the first and underlying requirement for termination, can be a fundamentally fair procedure protecting the parents' liberty interest is inconceivable to me.

¶64 The Court also relies at ¶ 45 on the parents' agreement to a treatment plan sometime prior to the May 6 hearing, in which they purportedly "admitted their children were abused or neglected." The truth of the matter is somewhat different, however, as the record and transcripts reflect. Soon after the DPHHS filed its initial petition for adjudication and for TIA, the District Court entered an order to show cause, observing that there was probable cause to believe that J.C. and A.D. were abused or neglected or in danger of being abused or neglected. That order also gave the DPHHS certain emergency authority and set the March 8 show cause hearing. Prior to that hearing and without authority or approval from the District Court, the DPHHS presented the parents with the first treatment plan. The parents—no doubt eager to keep the children at home and cooperate with the DPHHS—signed the treatment plan, as did the DPHHS. It was presented to the trial court during the March 8 hearing, and an objection was made—and resolved—regarding one of the elements of the treatment plan. The other elements of the plan were not challenged. At that hearing, the parents stipulated to TIA and the District Court set a review hearing for the following month.

¶65 This process totally ignores the mandates in § 41-3-443(1), MCA, pursuant to which the court may approve a treatment plan *if* the parents admit the allegations of abuse and neglect, the parents stipulate to the allegations or the court has made the adjudication of youths in need of care. Conversely, it also ignores § 41-3-434(2), MCA, which allows a parent to stipulate to a treatment plan *if* the child has been adjudicated a YINC. The

33

statutes simply do not contemplate or allow the kinds of procedures used by the DPHHS, its counsel and the trial court in this case.

¶66 Notwithstanding, the Court construes the parents' agreement to the formatted treatment plan—which sets forth goals, tasks for the parents and tasks for the social worker—as admissions to the allegations of abuse and neglect. It does so on the theory that, because the beginning portion of the "Treatment Plan" is captioned **IDENTIFICATION OF THE PROBLEMS OR CONDITIONS THAT RESULTED IN THE ABUSE OR NEGLECT**, the parents' signatures admitted that abuse or neglect occurred. This cannot be so. The record and transcripts of the March, April, May, July and October of 2005 hearings make no mention of such admissions; they clearly do reflect the parents' agreement with the elements of the treatment plan, with TIA, with TLC, and with an extension of TLC. The separate section of the document on which the Court relies has nothing at all to do with the elements, goals and tasks of the treatment plan portion to which the parents did agree. The DPHHS simply cannot be permitted to "hornswoggle" unsuspecting parents into damning admissions in such ways. And yet this is the portion of the various "treatment plans" on which the Court relies in attempting to distinguish *In re B.N.Y.* and *In re M.O.* According to the Court, ¶47, signing treatment plans containing separate sections of allegations of abuse or neglect constitutes a stipulation to abuse or neglect. In my view, it does not and cannot.

¶67 The Court also states that the parents stipulated to the TLC and the TLC Extension Petitions, both of which stated that the evidence established that the children were YINC. This is simply incorrect. The parents stipulated to TLC and to extension of TLC, and

34

nothing of record reflects stipulations or admissions to anything more. Finally, no evidence or testimony was taken at any of the hearings in which an adjudication of YINC could have timely taken place.

¶68    I cannot join in the Court's approach, analysis or resolution of this case. I would reverse the District Court, and I dissent from the Court's failure to do so.


                                                      /S/ KARLA M. GRAY




Justice James C. Nelson dissents.

¶69    I join Chief Justice Gray's dissent and likewise respectfully state my strenuous disagreement with the Court's decision.

¶70    Youth-in-need-of-care cases are some of the most difficult this Court reviews. Indeed, in my nearly 15 years serving as a member of this Court, I can honestly say that there are few cases where the child or children would not be better off with an adoptive family, a foster family, or in a group living arrangement, than being "parented" by the biological parents. Time and time again we see innocent children as the victims of sexual and physical abuse or abject neglect; living in filth that animal control officers would condemn; and "parented" by incompetent and uncaring "parents" who operate in a haze of methamphetamine or some other chemical. We see children whose lives and

development are devastated by the people who should be teaching and nurturing them. Every case is different; but every case is as bad as, or worse than, the last. Indeed, if the best interests of the child were the sole criteria for terminating parental rights, our jobs would be simple. We could simply state the facts of the case and affirm.

¶71 However, given the fundamental liberty interest of parents to parent and to not suffer termination of that interest except through fundamentally fair procedures—*see In re D.B.,* 2007 MT 246, ¶ 17, 339 Mont. 240, ¶ 17, 168 P.3d 691, ¶ 17—the Legislature has imposed upon the government a statutory scheme which protects that right. It is the duty of the county attorney, DPHHS, and the trial courts to follow these statutes. And, it is our job to make sure they do.

¶72 Unfortunately, in many cases, this Court turns a blind eye when this statutory scheme is not followed.[1] We justify this approach because, in our view, the best interests of the child or children are better served than requiring the government to follow the law.

¶73 There is mischief in this approach, however. We encourage sloppy practice and procedures in the termination process, we deny parents the benefit of their constitutional rights and of the laws the Legislature has enacted, and we invite trial courts to short-circuit the statutory scheme.

---

[1] *See In re K.J.B.*, 2007 MT 216, 339 Mont. 28, 168 P.3d 629; *In re B.B.*, 2006 MT 66, 331 Mont. 407, 133 P.3d 215; *In re A.N.W.*, 2006 MT 42, 331 Mont. 208, 130 P.3d 619; *In re A.T.*, 2006 MT 35, 331 Mont. 155, 130 P.3d 1249; *In re S.C.*, 2005 MT 241, 328 Mont. 476, 121 P.3d 552; *Inquiry into M.M.,* 274 Mont. 166, 906 P.2d 675 (1995); *Matter of F.H.,* 266 Mont. 36, 878 P.2d 890 (1994).

¶74    Indeed, there is no incentive for the government to follow the law since there is no consequence for violating it.

¶75    I, too, dissent from this approach.

/S/ JAMES C. NELSON